TCG NEW YORK, INC., TC Systems, Inc., and Teleport Communications d/b/a TCNY, Plaintiffs,

v.

CITY OF WHITE PLAINS, NEW YORK, Defendant.

No. 99CIV.4419(BDP).

United States District Court, S.D. New York.

Dec. 20, 2000.

Daniel L. Carroll and Leigh Roveda, Hutton Ingram Yuzek Gainen Carroll & Bertolotti, New York City, Robert G. Scott and T. Scott Thompson, Cole Raywid & Braverman, Washington DC, for the plaintiffs.

Anthony D. Boccanfuso and Philip W. Horton, Arnold & Porter, New York City, for the defendant.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiffs TCG New York, Inc., TC Systems, Inc. and Teleport Communications d/b/a TCNY (collectively, "TCG" or "Plaintiffs") commenced this action against the City of White Plains (the "City" or "Defendant"), alleging violations of § 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253 (the "TCA"), the Fourteenth Amendment of the United States Constitution and New York state law. The case was tried to the Court on a statement of stipulated facts (the "Stipulated Facts"). This Court's decision, based on those facts, follows.

## BACKGROUND

Plaintiffs are all wholly-owned subsidiaries of Teleport Communications Group, a subsidiary of AT & T Corporation, and are in the business of providing telephone and telecommunications services. Plaintiff TC Systems, Inc. is organized to construct, own, use and maintain lines for telephone purposes within the State of New York under the New York Transportation Corporations Law. *See* N.Y. Transp. Corp.

Law §§ 2, 25. Plaintiffs have been issued certificates of public convenience and necessity by the New York Public Service Commission ("PSC") for the provision of public telephone service in the State of New York. *See* N.Y. Pub. Serv. Law § 99.

The City is a municipal corporation and a political subdivision of the State of New York. Plaintiffs have sought the City's approval to construct telecommunications facilities and place other equipment in the City's rights-of-way, in particular new conduit networks as well as a fiber optic network of cables to run through new and preexisting conduits in the City.

## I. The City Ordinance

On December 1, 1997, in response to Congress' enactment of the TCA in 1996, the City passed an ordinance setting forth the process by which new telecommunications carriers could obtain approval to place equipment in the City's rights-of-way (the "Ordinance"). *See* White Plains Municipal Code, Telecommunications Franchising and Licensing, Articles 1—3.

The Ordinance requires that a carrier submit a *formal application* to the Commissioner of Public Works and the Office of Corporation Counsel which must include, *inter alia,* information regarding the carrier, its affiliates, the equipment to be placed in the rights-of-way, the carrier's construction plans, its legal, financial, technical and other appropriate qualifications, and the financing for the proposed construction. *See* Ordinance §§ 2–3–01 & 02.

After the application is complete, the Ordinance requires that the carrier obtain a "franchise," or, in the case of carriers seeking only a limited use of the rights-of-way (e.g., installing less than 2500 feet of cable), a "revocable license." *See* Ordinance § 2–1. The parties are required to negotiate the terms of the franchise agreement or the revocable license, including compensation to the City, insurance, per-

formance bonds, the City's right to inspect the premises, indemnification requirements, non-assignment clauses and other provisions. *See* Ordinance §§ 2–6, 2–9.

Once the carrier and City reach an agreement, the application is referred to the Common Council, which may reject the application or adopt it by a separate ordinance. *See* Ordinance § 2–1–04. In its review, the Common Council may consider a number of factors, including, *inter alia,* the carrier's ability to satisfy construction requirements and to maintain the City in good condition, the adequacy of the terms of the franchise agreement or license, the adequacy of the compensation to the City, legal, financial, technical and other qualifications of the carrier and any other factors as Council deems appropriate and in the public interest of the City. *See* Ordinance § 2–7.

## II. Negotiation of the Franchise Agreement

The parties have had numerous discussions since early 1992 regarding the possible use of the City's rights-of-way in connection with TCG's plan to construct telecommunications facilities. TCG formally applied in 1992 and 1994, regularly communicating with City representatives in an attempt to obtain the City's consent.[1]

In April 1998—following the enactment of the Ordinance—TCG filed a formal application with the City for a revocable licence to install a relatively small amount of fiber optic cable and about 240 feet of underground conduit. Soon thereafter, TCG requested a full-blown franchise, and made a formal application for a franchise in February 1999.

Since TCG's request, the parties have engaged in vigorous negotiations, particularly over a May 1999 draft of the proposed franchise agreement, the terms of which were substantially based upon a

---

1. To date, no decision has been rendered by the City concerning the 1992 and 1994 appli-

cations, as they are presumably considered moot by the actions that followed.

"Model Franchise" which the City seeks to impose on all prospective telecommunications providers.[2] When it was clear that agreement could not be reached on the terms of that proposal, TCG filed this lawsuit on June 18, 1999, alleging violations of federal, state and constitutional law.

After the initiation of this lawsuit, the parties attempted to resolve their differences, and their negotiations resulted in an offer by the City of a new proposed franchise agreement (the "August Proposal") which sought to address some, but not all, of TCG's objections. As a result of further negotiations, the City offered additional modifications to the August Proposal, which were not sufficient to satisfy TCG.[3]

The City's August Proposal would, *inter alia*, require TCG to pay an annual franchise fee to the City equal to five percent of gross revenues, require a guarantee of payment from its parent corporation, and would require that TCG build a limited amount of additional conduit without charge at the City's request. In addition, the August Proposal would reserve the right of the City to examine TCG's records, impose a most favored vendees status on behalf of the City, and mandate that upon termination of the agreement, TCG would be required to remove its facilities from public property at its own expense.

## III. Treatment of Bell Atlantic

The current incumbent local exchange telephone carrier in the City is Bell Atlantic (and its predecessors-in-interest, NYNEX and New York Telephone). The City has had arrangements and understandings with Bell Atlantic since as far back as 1919, at which time Bell Atlantic agreed to provide the City with free conduit for certain municipal uses. Throughout the years, a symbiotic relationship existed between Bell Atlantic and the City, whereby Bell Atlantic would provide free conduit space in exchange for permission to use the City's public rights-of-way. Since 1954, Bell Atlantic has constructed an extensive underground conduit network in the downtown area of the City, which is more extensive than the underground facilities constructed by, or proposed to be constructed by, any other telecommunications provider in the City, including TCG. Of the thirty-one mile network of fiber optic cable and copper wire that make up the City's own network, twenty miles are in conduit owned by the City on aerial poles owned by Bell Atlantic and ConEd. The other eleven miles are run through underground conduit provided by Bell Atlantic at no cost to the City.

Consequently, Bell Atlantic is not subject to the regulations set forth in the Ordinance, and is not required to obtain, and does not have, a franchise agreement

2. The City has previously come to terms with Brooks Fiber (a subsidiary of MCI Worldcom, Inc.), Northeast Networks, Inc. and Metromedia Fiber Network Services, Inc., who have each agreed to essentially the same terms in the Model Franchise, as well as Qwest Communications Corp. and Northeast Optice Network, Inc., who have been granted revocable licenses.

3. There appears to be some confusion between the parties concerning the latest version of the franchise agreement. While plaintiffs refer in their trial papers only to the provisions of the May 4th proposal, both parties have acknowledged—in the Stipulated Facts—that the August Proposal was, indeed, delivered to and received by TCG in the summer of 1999. The August Proposal, as well as subsequent modifications made thereto, renders some of the provisions TCG complains of moot, including, *inter alia*, the "most favored nations" clause (§ 2.2 in the May draft), the requirement that title to TCG's facilities pass to the City upon termination of the franchise (§§ 4.3, 4.5 and 4.6 in the May draft), the requirement that TCG pay a fee if it wishes to transfer the franchise (§ 15.2 in the May draft), the requirement that TCG submit annual financial reports and other reports (§§ 9.5, 13.4—13.6 in the May draft) and the provision stating that TCG would comply with the agreement and pay the franchise fee even if it were deemed illegal (§ 9.1(b) in the May draft). For purposes of this opinion, the Court assumes that the August Proposal, including its modifications, is the relevant version in dispute.

with the City. Unlike new providers of telecommunications services in the City, Bell Atlantic does not pay a franchise fee, is not subject to the same general construction permitting requirements, and is free from requirements for insurance, deposits and permitting fees.

### IV. TCG's Claims

TCG objects to the requirements that the City seeks to impose on several grounds. First, plaintiffs claim that provisions of the Ordinance and the August Proposal effectively prohibit TCG from providing telecommunications services, and regulate beyond the City's public rights-of-way, violating § 253(a), (b) and (c) of the TCA (Claims 1—4, 6—8, 11 and 12 of the Complaint). Second, TCG complains that Bell Atlantic's *de facto* exemption from the Ordinance, and from having to enter into a franchise agreement, is both non-competitive and discriminatory against TCG, in violation of § 253(c) of the TCA (Claim 5). Third, TCG claims that the Ordinance and the August Proposal violate the New York Transportation Corporations Law and the New York Public Service Law (Claims 9—12). Finally, TCG contends that the City has denied plaintiffs' due process rights under the Fourteenth Amendment (Claim 13).

### DISCUSSION

### I. The Telecommunications Act of 1996

The gravamen of plaintiffs' complaint is that the City's regulations set forth in the Ordinance and the August Proposal are preempted under § 253 of the TCA. Accordingly, a brief look at the history and structure of the TCA is helpful.

By adopting the TCA in 1996, Congress "fundamentally restructure[d] local telephone markets" by prohibiting states and local governments from "enforc[ing] laws that impede competition." *AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). For nearly a century, the rationale behind the regulation of the telecommunications industry presumed that telephone monopolies would best provide reliable and universal service. *See Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston*, 184 F.3d 88, 97 (1st Cir.1999). The promulgation of the TCA, however, signaled the abandonment of that regulatory philosophy, as the federal statute now "requires [incumbent carriers] to provide other participants in the telecommunications market with competitive access to their networks and services." *Id.* As a result, competitive local exchange carriers, or CLECs, may now offer service in competition with incumbent local exchange carriers, or ILECs. *See Id.* at 271–73.

At the heart of the present dispute is the meaning and structure of § 253 of the TCA. That section, entitled "Removal of Barriers to Entry," states, in relevant part:

(a) In general—No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority—Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority—Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

The structure and language of § 253 embodies the balance between Congress' "new free market vision" and its recognition of the "continuing need for state and local governments to regulate telecommunications providers on grounds such as consumer protection and public safety." *Cablevision,* 184 F.3d at 98. Under § 253(a), state or local regulations may not prohibit or have the effect of prohibiting telecommunications services—if so, then the relevant regulations are preempted by that provision, unless they can come under the safe harbors set forth in § 253(b) or (c). *See Cablevision,* 184 F.3d at 98 (calling § 253(b) and (c) "safe harbors" to the prohibition of § 253(a)); *Sprint Spectrum L.P. v. Mills,* 65 F.Supp.2d 148, 159 (S.D.N.Y.1999) ("Section 253 preempts all state and local regulations that prohibit or have the effect of prohibiting any company's ability to provide telecommunications services, unless such regulations fall within either of the statute's two "safe harbor" provisions.") (internal quotations and citations omitted); *AT & T Communications of the Southwest, Inc. v. City of Dallas,* 8 F.Supp.2d 582, 587 (N.D.Tex.1998) (same).

§ 253(b) preserves the ability of a state to regulate telecommunications on the basis of the "public good." "Requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers" are permissible so long as they are imposed on a competitively neutral basis. 47 U.S.C. § 253(b). Conjointly, § 253(c) reserves the authority of state and local governments to regulate the public rights-of-way, as well as their right to charge "fair and reasonable compensation," so long as they are conducted on a competitively neutral and nondiscriminatory basis. 47 U.S.C. § 253(c).

Plaintiffs contend that the City has violated § 253(b) by regulating "public good" issues in the Ordinance and the August Proposal. However, that sub-section only preserves certain state activities, and does not speak to local regulation. *See Southwestern Bell Wireless, Inc. v. Johnson County Board of County Commissioners,* 199 F.3d 1185, 1192 (10th Cir.1999) ("section 253(b) applies only to state, not local, regulation"); *City of Dallas v. Metropolitan Fiber Systems of Dallas, Inc.,* 98 civ. 2128, 2000 WL 198104, at *4 (N.D.Tex. Feb.17, 2000) (agreeing that § 253(b) was not applicable to municipalities). To the extent TCG complains of local regulation, it should rely upon § 253(c). Therefore, as an initial matter, this Court dismisses plaintiff's claims based upon § 253(b) (Claims 6 and 8).[4]

Accordingly, the question of whether the City's actions violate § 253 of the TCA involves a two-step analysis: (i) whether the City's regulations "prohibit or have the effect of prohibiting" the ability of TCG to provide telecommunications services under § 253(a), and (ii) if so, whether they are "saved" under § 253(c).

### A. "Prohibit or Have the Effect of Prohibiting" under § 253(a) of the TCA

The parties fundamentally disagree over the scope of § 253(a); namely, the degree to which local actions are preempted under that section. Plaintiffs argue, citing, *inter alia, City of Dallas,* 8 F.Supp.2d at 591, *BellSouth v. City of Coral Springs,* 42 F.Supp.2d 1304, 1307 (S.D.Fla.1999) and *Bellsouth Telecommunications, Inc. v. Town of Palm Beach,* 127 F.Supp.2d 1348, 1352 (S.D.Fla.1999), that § 253(a) broadly preempts action by local municipalities, suggesting that only the narrow range of activities presented in § 253(c) are permissible. Under TCG's reading of the TCA, virtually all local action is preempted, unless, of course, it purports to manage rights-of-way on a non-discriminatory and competitively neutral basis under § 253(c).

---

4. In any event, TCG does not seek to take advantage of the § 253(b) safe harbor.

However, defendant argues, citing legislative history and *In re TCI Cablevision of Oakland County, Inc.*, Memorandum Opinion and Order, 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 101 (F.C.C. Sept.19, 1997), for a narrower approach. The City contends that § 253(a) only preempts local action that actually prohibits a carrier from providing telecommunications services. Because nothing in the Ordinance or the City's treatment of TCG explicitly prevented TCG from providing telecommunications services in the City, the City argues that there is no violation of § 253(a). Accordingly, the question of whether local action manages the public rights-of-way under § 253(c), the City argues, does not arise since such action is not prohibitory under § 253(a). *See In re TCI Cablevision*, 12 F.C.C.R. 21396, at ¶ 101 ("Parties seeking preemption of a local legal requirement ... must supply ... credible and probative evidence that the challenged requirement falls within the proscription of section 253(a) without meeting the requirements of ¶ 253(b) and/or (c).").

Neither argument is completely compelling. On the one hand, the parameters of what is considered prohibitory under § 253(a) are not likely to be so broad as to preempt any and all local action. Congress could have achieved that result by simply preempting all local action in § 253(a) rather than specifically dealing only with actions which "prohibit or [have] the effect of prohibiting" telecommunications services. *See* 47 U.S.C. § 253(a). On the other hand, the bar set by § 253(a) cannot be so high as to permit local municipalities to frustrate Congress' intent to foster a pro-competitive environment and remove local barriers to entry for telecommunications providers simply by clever statutory drafting. *See RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir.2000) (a barrier need not be "insurmountable" or complete to be considered prohibitory under § 253(a)).

The Court need not determine here, however, what the outer parameters of § 253(a) are. Instead, this Court finds only that TCG has met its burden in demonstrating that the regulations and actions of the City (described in the Stipulated Facts) violate § 253(a). *See In re Petition of the State of Minnesota*, F.C.C.R. 99–402, ¶ 11 n. 26 (F.C.C. December 20, 1999) (party seeking preemption bears the burden of proof that there was a violation of ¶ 253(a)).

In this case, the requirements imposed on TCG by the City and the Ordinance, when viewed as a whole and in context, have the effect of prohibiting the ability of TCG to provide telecommunications services. *See Bell Atlantic–Maryland, Inc. v. Prince George's County, Maryland*, 49 F.Supp.2d 805, 814 (D.Md.1999), *vacated on other grounds*, 212 F.3d 863 (4th Cir. 2000) ("[A]ny process for entry that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decisionmakers to grant or deny permission to use the public rights-of-way" has "the effect of prohibiting" service.); *AT & T Communications of the Southwest v. City of Dallas*, 52 F.Supp.2d 763, 770 (N.D.Texas 1999) (a representation by the city that "without a new franchise ... AT & T may not offer [services]" is "sufficient proof of the requisite prohibitive effect that triggers the preemptive force of § 253(a)."); *see also AT & T Communications of the Southwest v. City of Austin*, 975 F.Supp. 928, 939 (W.D.Texas 1997) ("The threat of criminal sanctions and fines for the failure of an entity to obtain municipal consent can indubitably only be described as a prohibition.").

■ As an initial matter, the Ordinance prohibits a carrier from using the City's rights-of-way without first applying for and then obtaining a franchise. The Ordinance requires that every franchise must contain certain broad terms and conditions, such as the compensation to be paid to the City, the City's right to inspect

facilities and records of the franchisee, a restriction on the assignment or other transfer of the facility without prior written consent by the City, and such other provisions the City determines are necessary or appropriate "in furtherance of the public interest." *See* Ordinance § 2.9.01.

In this particular case, as well documented by the Stipulated Facts, the process of obtaining a franchise has turned into a lengthy and complex negotiation between the parties, spanning over seven years since TCG's initial request in 1992, one a half years since TCG's first request after the promulgation of the Ordinance and more than half a year since TCG's re-application in February 1999. *See City of Austin,* 975 F.Supp. at 938 ("It goes without saying that delayed entry into the local telephone service market can have profound effects on the success of [plaintiff's] venture"). Even if the parties were able to come to terms on the provisions of the franchise agreement, the Ordinance nonetheless gives the Common Council the right to reject the application based on any "public interest factors ... that are deemed pertinent by the City." Ordinance § 2–7. Once the City identifies such factors, § 2.7 starts the entire, complex process all over again. *See Prince George's County,* 49 F.Supp.2d at 814.

Accordingly, while the City's requirements admittedly do not impose an explicit

prohibition on TCG, the regulations coupled with the City's long delay in moving forward with the approval process have effectively prohibited TCG from providing telecommunications services in White Plains. *See RT Communications, Inc. v. FCC,* 201 F.3d 1264, 1268 (10th Cir.2000) ("the extent to which the [local] statute is a complete bar is irrelevant. Nowhere does the [TCA] require that a bar to entry be insurmountable before the FCC must preempt it."). As a result, § 253(a) has been violated.

**B. Are the City's Regulations Saved by § 253(c)?**

A finding that local regulations violate § 253(a) of the TCA is not fatal so long as the defendant can show that those regulations satisfy the safe harbor provisions set forth in § 253(c).[5] To determine whether § 253(c) is satisfied here, three questions must be addressed. First, do the City's regulations "manage the public rights-of-way"? Second, are the required fees "fair and reasonable compensation" for the use of the public rights-of-way? And third, is the exemption of Bell Atlantic from the City's regulations competitively neutral and nondiscriminatory?[6]

**1. *Do the Regulations Manage the Public Rights-of-way?***

§ 253(c) preserves the authority of local governments to manage the public rights-

5. Once the party seeking preemption sustains its burden to show that a local municipality has violated § 253(a) by prohibiting or effectively prohibiting service, the burden of proving that a statute or regulation comes within the safe harbor in § 253(c) falls on the party claiming that the safe harbor applies—in this case, the City. *See In re Petition of the State of Minnesota,* F.C.C.R. 99–402, at ¶ 11 n. 26 (citing *In re the Public Utility Commission of Texas,* 13 F.C.C.R. 3460, ¶ 83 (F.C.C.1997)).

6. The issue of whether § 253(c) imposes separate restrictions against local regulations apart from the restriction against government prohibition under § 253(a), and, hence, whether an implied cause of action exists under § 253(c), is an open one. *See Cablevision,* 184 F.3d at 98, 99; *Omnipoint Communications, Inc. v. The Port Authority of New*

*York and New Jersey,* 1999 WL 494120, at *6 n. 5 (S.D.N.Y. July 13, 1999) ("it is not clear that Section 253(c) provides plaintiff with a private cause of action. No private cause of action is expressly provided, and courts have split over whether one is implied. The Second Circuit has not yet considered this issue.") (internal citations omitted); Compare *GST Tucson Lightwave, Inc. v. City of Tucson,* 950 F.Supp. 968 (D.Ariz.1996) (finding no private right of action); with *TCG Detroit v. City of Dearborn,* 977 F.Supp. 836 (E.D.Mich. 1997), affirmed, 206 F.3d 618 (6th Cir.2000)(finding a private right of action). In any event, since this Court has held that § 253(a) was violated, § 253(c) is automatically triggered, and the Court need not decide that open issue here.

of-way. A growing number of district courts that have reviewed this issue have relied upon the Federal Communications Commission (the "FCC"), the agency charged with interpreting and enforcing the TCA, for guidance. *See e.g., Omnipoint Communications, Inc. v. The Port Authority of New York and New Jersey,* 1999 WL 494120, at *10–11 (S.D.N.Y. July 13, 1999); *PECO v. Township of Haverford,* 1999 WL 1240941, *4–6, 1999 U.S. Dist. LEXIS, 19409, at 15–19; *Town of Palm Beach,* 127 F.Supp.2d at 1352–53; *City of Coral Springs,* 42 F.Supp.2d at 1308; *Prince George's County,* 49 F.Supp.2d at 815; *City of Dallas,* 8 F.Supp.2d at 591–92.

In *In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 (F.C.C.1996), the FCC quoted from the comments of Senator Diane Feinstein in the Congressional Record, citing examples of the kinds of regulations Congress intended to permit under ¶ 253(c):

— "regulat[ing] the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts"

— "requir[ing] a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies"

— "requir[ing] a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavations"

— "enforc[ing] local zoning regulations" [and]

— "requir[ing] a company to indemnify the City against any claims of injury arising from the company's excavation."

*Id.* ¶ 39 (citations omitted).

These categories of activities were expanded in *In re TCI Cablevision,* 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 101, where the FCC stated:

Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way. . . . [T]ypes of activities that fall within the sphere of appropriate rights-of-way management . . . include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*Id.,* 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 103. There, the FCC expressed concern over a "third tier" of regulation by some localities that appear to "reach[ ] beyond traditional rights-of-way matters," including most favored nation requirements and mandating that franchisees interconnect with other telecommunications systems for furtherance of universal service. *Id.,* 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 105. Accordingly, any attempt to regulate beyond the circumscribed scope of activities related to public rights-of-way is beyond the scope of ¶ 253(c).

#### a. *The Ordinance*

The Ordinance sets forth a three-part process for obtaining local approval. First, the applicant must complete a pre-franchise application to the Commissioner of Public Works and the Office of Corporation Counsel. *See* §§ 2–3–02(i)—(viii). Second, the applicant and City must then negotiate over the specific terms required to be included in the franchise agreement. *See* §§ 2.9.01(i)—(xvii). And third, once it has been fully negotiated, the Common Council must review and separately approve the franchise agreement. *See* §§ 2–7–01(i)—(vii).

The pre-franchise application process seeks certain information that could easily be construed as relating to the management of the public rights-of-way, such as contact information of the applicant (§ 2–

3–02(i)), a description of the proposed franchise area (§ 2–3–02(iii)), a proposed construction schedule (§ 2–3–02(iv)), a map of the proposed location of the applicant's telecommunications system (§ 2–3–02(v)), and ownership of the applicant and identification of affiliates (§ 2–3–02(viii)). These provisions "relate directly to the construction of a telecommunications facility, and seeks descriptions of how the new facility fits into the affected rights-of-way." *City of Coral Springs*, 42 F.Supp.2d at 1310.

■ However, the parties have conceded that § 2–03–02(ii), which requires a description of the telecommunications services to be provided, does not directly relate to the management of the City's rights-of-way. *See* Stipulated Facts ¶ 43. This Court agrees, and, accordingly, § 2–03–02(ii) violates § 253(c) and is preempted by the TCA.[7] *See City of Coral Springs*, 42 F.Supp.2d at 1309 ("the City does not have the authority to request information regarding systems, plans, or purposes of the telecommunications facilities.").

■ Moreover, §§ 2–3–02(vi) and (vii) require information concerning the provider's proposed financing for the operation and construction of the services to be provided, as well as a description of the applicant's legal, financial, technical and other appropriate qualifications to hold the franchise. Setting aside the fact that § 94 of the New York Public Service Law appears to have already delegated the authority to review these categories of information to the New York Public Service Commission ("PSC"), a number of courts have ruled

that regulations requiring "the applicant [to] submit proof of its financial, technical and legal qualifications" do not regulate the public rights-of-way. *Town of Palm Beach*, 127 F.Supp.2d at 1355; *City of Dallas*, 8 F.Supp.2d at 593 ("Dallas also does not have the power to require a comprehensive application and consider such factors as the company's technical and organizational qualifications to offer telecommunications services."); *City of Coral Springs*, 42 F.Supp.2d at 1310 (striking local statute requiring that the applicant submit proof of its "financial, technical and legal qualifications"). Therefore, §§ 2–3–02(vi) and (vii) are preempted by the TCA.

In connection with the requirement that a franchise agreement be negotiated, the Ordinance sets forth the terms that must be incorporated in such an agreement. *See* § 2.9.01(i)—(xvii). Aside from § 2.9.01(iii) (*see infra*, § II.B.2), the terms identified in the Ordinance, for the most part, properly address rights-of-way and related issues.

■ To begin with, several of §§ 2.9.01's requirements deal with general unobjectionable provisions to be included in the franchise agreement—the term of the franchise (§ 2.9.01(i)), circumstances upon which the franchise may be terminated or cancelled (§ 2.9.01(iv)), and provisions to ensure that the franchisee comply with applicable laws (presumably so long as they comport with the TCA) (§ 2.9.01(x))—while certain others relate directly to the core of the City's rights-of-

7. "The determination of whether an invalid portion of a state statute can be severed from the valid portions so that the remainder of the statute can be preserved is a question of state law." *Gary D. Peake Excavating Inc. v. Town Board of the Town of Hancock*, 93 F.3d 68, 72 (2d Cir.1996). The New York test for severability is whether the state legislature "would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *Greater New York Metropolitan Food Council, Inc. v. Giuliani*, 195 F.3d 100, 110 (2d Cir.1999) (internal quotations omitted). Moreover, under New York law, " 'a court should refrain from invalidating an entire statute when only portions of it are objectionable.' Although the presence of a severability clause is not dispositive, '[t]he preference for severance is particularly strong when the law contains a severability clause.' " *Gary D. Peake*, 93 F.3d at 72 (quoting *National Advertising Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir.1991)). Given the presence of the severability provision in the Ordinance, *see* § 3–1 of the Ordinance, and the New York standard of severability, this Court declines to invalidate the entire Ordinance, but rather just the portions of the statute it finds invalid.

way authority discussed in the FCC cases above—provisions concerning performance bonds, security, insurance and indemnification requirements (§ 2.9.01(v) and (vii)), provisions to ensure workmanship quality and construction methods (§ 2.9.01(ix)), obligations to supply an engineering site plan (§ 2.9.01(xi)), requirement that franchisee obtain all necessary licenses (§ 2.9.01(xiv)), provisions protecting the City from property damage or interruption of operations (§ 2.9.01(xv)), and provisions designed to minimize the extent to which public use of the streets are disrupted (§ 2.9.01(xvi)). *See In re TCI Cablevision,* 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 101; *In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082, at ¶ 39.

■ Further, § 2.9.01(xii), which restricts the assignment or transfer of the franchise without the prior consent of the City, prevents a carrier from escaping the City's rights-of-way regulation by simply having the franchise assigned to it after it was approved for another entity. § 2.9.01(xiii) relates to remedies available to the City to protect the City's interests in the event the franchisee defaults under or fails to comply with the agreement. These provisions are simply enforcement mechanisms designed to give meaning and effect to valid provisions of the franchise. *See Town of Palm Beach,* 127 F.Supp.2d at 1355 (stating that provisions "provid[ing] the mechanism for the Town to enforce [the] ordinance" was "valid in its entirety.").

■ However, the remaining four subsections in this section of the Ordinance are either invalid or potentially problematic. First, for reasons already discussed, § 2.9.01(ii), which requires information concerning the nature of the telecommunications services to be offered, does not manage the rights-of-way and is invalid. Second, § 2.9.01(xvii), which permits the City to include any provisions in the franchise which it "determines are necessary

or appropriate in furtherance of the public interest," is, in this case, too overly-vague and overly-broad to be in compliance with § 253(c) of the TCA. The discretion afforded the City in adding any provision that it considers to be in the "public interest" go well beyond the traditional scope of management of the public rights-of-way. Accordingly, the Court finds that sub-section to be preempted by the TCA because it leaves the City near total discretion to approve or reject an application.

■ Finally, the Court notes that § 2.9.01(vi), which relates to the City's right to inspect facilities and records of the franchisee, and § 2.9.01(viii), which requires that the franchisee maintain complete and accurate books and the City's inspection rights thereto, must be read narrowly to satisfy the requirements of § 253(c). Therefore, while the City has broad rights to negotiate provisions permitting it to inspect facilities in the rights-of-way, its rights concerning inspection of records and requiring the carrier to maintain complete and accurate records must be limited to information necessary to enforce its rights-of-way regulations and to ensure that it has received accurate fee information.

■ The third part of the approval process set forth in the Ordinance deals with the review by the Common Council of the franchise agreement after it has been fully negotiated. Sections 2–7–01(i)—(vii) set forth the factors that the Common Council may use in deciding whether to accept or reject a negotiated franchise.[8] Factors relating to the ability of the applicant to maintain the property of the City in good condition (§ 2–7–01(iii)), services or uses of the streets that may be precluded by the grant of the franchise, as well as any adverse impact of the proposed franchise in the efficient use of the streets (§ 2–7–01(iv)), and the willingness of the applicant to meet construction and physical require-

---

8. § 2–7–01(i), which permits the Council to consider the adequacy of the proposed com-

pensation to be paid to the City, is again set aside for a later discussion (*infra* § II.B.2).

ments and abide by all lawful conditions (§ 2–7–01(v)) fall within the City's authority to manage the public rights-of-way.

For reasons previously discussed, § 2–7–01(ii), which permits the Common Council to consider the legal, financial and technical qualifications of an applicant in deciding whether to approve the franchise, is not valid and is preempted by the TCA.

The remaining two sub-sections under § 2–7–01 are problematic as they permit approval based upon the "adequacy of the ... franchise agreement ... to protect the public interest" (§ 2–7–01(vi)), as well as "any other public interest factors or considerations ... that are deemed pertinent by the City for safeguarding the interests of the City and the public" (§ 2–7–01(vii)). These provisions give the Council nearly unfettered discretion in rejecting an otherwise proper application for a franchise. *See Prince George's County,* 49 F.Supp.2d at 816 ("most objectionable is the fact that the ordinance vests the County with complete discretion to grant or deny a franchise application based on a wide-ranging set of factors that include "whether the proposal will serve and protect the public interest." "); *PECO Energy,* 1999 WL 1240941, *6, 1999 U.S. Dist. LEXIS 19409, at *20 ("This apparently limitless discretion of the Township Manager to grant or deny a franchise places the Ordinance outside the ambit of the TCA's safe harbor."); *City of Dallas,* 8 F.Supp.2d at 593 ("The City does not, however, have the authority to grant or deny that franchise based on its own discretion."). Accordingly, those sub-sections of the Ordinance are preempted by the TCA and are invalid.

b. *The August Proposal*

The provisions set forth in the August Proposal, and the modifications thereto, are provisions that the City has indicated that it intends to impose onto TCG—in other words, they are provisions that TCG

must accept in order to obtain a franchise. Accordingly, each of the provisions therein must comport to § 253(c), and, therefore, must also relate to the management of the City's public rights-of-way.

Against this backdrop, the Court reviews the following provisions of the August Proposal objected to by TCG in its trial brief.[9]

1. Non-exclusivity (§ 2.2): TCG's objection to this provision is not clear. To the extent it objects to the statement that the franchise is nonexclusive, plaintiffs have no valid complaint as nonexclusivity is required by the TCA. To the extent TCG complains about the wording of that provision which, under one reading, could purport to regulate telecommunications services—"[t]his franchise is a non-exclusive grant to provide Services pursuant to the terms herein"—that phrase has been replaced with clearer language in the August Proposal—"[t]his franchise is a non-exclusive grant to construct, operate and maintain the Fiber Optic Network in the Streets for the purpose of providing Services."

2. "Most favored vendees" clause (§ 2.7): Under this provision, if the City, or an elementary or secondary educational institution in the City, should contract with TCG for any of its services, TCG is required to offer them rates and terms no less favorable than those offered to any other governmental or nonprofit agency in Westchester County. While the City innocently frames this provision as a form of "in-kind compensation," this Court finds that it is more akin to a regulation of TCG's rates, terms and conditions of service unrelated to TCG's use of the public rights-of-way, and resembles the kind of "most favored nations" clauses found to be unlawful by the FCC in *In re TCI Cablevision,* 12 F.C.C.R. 21396, at ¶ 105 (citing "most favored nations" mandates as exam-

**9.** As noted earlier (*supra* at note 3) certain provisions objected to by TCG are mooted by the replacement of the May 1999 draft with

the August Proposal. Moreover, provisions relating to franchise fees are addressed below (*infra* § II.B.2).

ples of local regulation over the "rates, terms and conditions" of service that are "difficult to justify under § 253(c) on the grounds that they are within the scope of permissible local rights-of-way management authority").

3. Representation of no conflict with laws (§ 3.1(4)): Section 3.1(4) seeks to require TCG to waive its legal right, including those under the TCA, to challenge the terms or conditions of the franchise agreement. As the cases make clear, these restrictions do not relate to rights-of-way management. *See In re Classic Telephone, Inc.*, 11 F.C.C.R. 13082, at ¶ 39; *In re TCI Cablevision*, 1997 WL 580831, 12 F.C.C.R. 21396, at ¶ 101. As such, a requirement that TCG waive its legal challenges in order to obtain the City's consent to provide telecommunications services is invalid under § 253(c). However, portions of the provision relating to the legal authorization of TCG to enter into the agreement and assume the obligations thereunder are standard contractual representation and warranty provisions that do not violate § 253(c).

4. Examination of records in connection with franchise fees (§ 8.5): This provision is specifically limited to the examination of documents related to the payment of fees and therefore is necessary to accurately determine and to collect fees permitted by the TCA. *See Town of Palm Beach*, 127 F.Supp.2d at 1354.

5. Approval for location of construction (§ 11.9(d)): TCG objects to this provision requiring that the City approve the location of any part of the network prior to its construction because it may include construction performed on private, as opposed to public, property. While it may be theoretically possible for construction on private property to impact the public rights-of-way, this provision is not limited to such situations and would require approval even where the construction would have no effect whatever on

public rights-of-way. Accordingly, this provision is invalid under § 253(c).

6. Examination of records (§ 12): These provisions permit the City broad rights to inspect and oversee the business of TCG, including the obligation of TCG to maintain complete and accurate books concerning its operations (§ 12.1). These provisions also grant the City the right to audit all accounting and financial records of TCG related to the fiber optic network on three days notice (§ 12.1), and require the availability of all such records at a particular location and/or upon request by the City (§ 12.2). These provisions go farther. They require annual submissions of a map setting forth the major physical elements of the network (§ 12.3), the approval of all locations of the network by the City (§ 12.3), and the submission of any financial information requested by the City concerning TCG's financial capability to comply with the agreement, as well as any information necessary to carry out the City's ability to manage the public streets (§ 12.4).

As discussed earlier, any requirement of maintenance and inspection of records must be limited to information necessary to enforce the City's rights-of-way regulations and to ensure that the City has received an accurate fee. The City's limited authority does not give it the power to micromanage TCG's business through audits and submission of detailed financial records, unless they are directly related to the rights-of-way or a proper fee. Accordingly, § 12.1 is far too broad to satisfy § 253(c) and, for that reason, is invalid. *Prince George's County*, 49 F.Supp.2d at 810 (finding requirement invalid that company provide financial information as not relating to rights-of-way management); *City of Dallas*, 8 F.Supp.2d at 593; *City of Coral Springs*, 42 F.Supp.2d at 1310. Moreover, as § 12.2 relates to records discussed in § 12.1, it is also invalid.

While the Court finds § 12.3's requirement for a submission of an annual map generally valid as an exercise of the City's

rights-of-way management, its requirement that all locations be approved by the City is invalid for the same reasons discussed above concerning § 11.9(d). Finally, because § 12.4 limits itself to information necessary to carry out the City's management of the public streets as well as TCG's ability to pay the required fee, this section is consistent with the scope of § 253(c).

7. Waiver to challenge terms of the franchise agreement (§ 13.6): for substantially the same reasons discussed above concerning § 3.1(4) above, this kind of requirement of waiver does not resemble the kinds of rights-of-way management contemplated by the FCC cases described above, and, accordingly, is invalid under § 253(c).[10]

2. *Are the proposed franchise fees "fair and reasonable compensation" under § 253(c)?*

■ The parties dispute whether the proposed fees are "fair and reasonable compensation" under § 253(c) of the TCA. The Ordinance itself provides little or no guidance on the calculation of the fees to be imposed by the City, leaving the details of the compensation to be negotiated in the franchise agreement. *See* § 2.9.01(iii) of the Ordinance. Once the franchise is fully negotiated, § 2–7–01(i) permits the Common Council to review and pass on the proposed fee. So long as the fees themselves comply with § 253(c), the Court does not view these provisions to be problematic under the TCA.

Section 8 of the August Proposal sets forth four categories of fees and costs to be paid by TCG to the City. First, § 8.1(a) imposes an annual franchise fee equal to five percent of all revenue derived by TCG or its affiliates in connection with the operation of the proposed telecommunications facilities within the City limits. Second, § 8.1(b) imposes a minimum annual fee starting from $5,000 in the first year, gradually increasing to $10,000 after the fifteenth year. Third, § 8.1(c) requires TCG to pay for costs of third parties (including attorneys' and consultants' fees) in connection with the award of the franchise. Fourth, § 8.2 requires that TCG build one thousand feet of conduit for the City at points where its proposed network overlaps the City's network currently under construction. Moreover, the provision also requires that TCG install additional conduit for municipal purposes along the proposed network for which the City would reimburse TCG for costs of materials. The City considers the requirements set forth in § 8.2 as "in kind" compensation to be paid by TCG. In addition, § 16 of the August Proposal requires that TCG's parent guarantee TCG's obligations under the agreement.

Complicating the analysis of whether these fees are proper under § 253(c), courts are split as to the nature of the fees local municipalities may charge carriers. Some courts have concluded that to be "fair and reasonable," fees must be directly tied to the carrier's use of and/or the municipality's costs of maintaining the public rights-of-way. *See Prince George's*

10. TCG also asserts two additional claims under § 253(c) concerning the City's rights-of-way management. First, TCG claims that the City may not assess a franchise fee or require a franchise agreement for TCG's resale of Bell Atlantic's services since this resale does not impact the public rights-of-way (Claim 11). However, the Stipulated Facts show that TCG has been selling telecommunications services in the City on a resale basis since 1993, and has never been required by the City to pay a fee or enter into a franchise for such activity. *See* Stipulated Facts ¶ 16. Moreover, the City acknowledges in its trial papers that it does not now seek a fee or a franchise for such resales. As there is no controversy, Claim 11 is dismissed. Second, TCG claims that the City cannot charge a fee or require a franchise for cables TCG seeks to run through preexisting conduit owned by Bell Atlantic (Claim 12). The fact that TCG will use some preexisting conduit, however, does not affect the City's authority to manage the rights-of-way or impose a franchise fee, since cables will nevertheless be placed in the public rights-of-way. Accordingly, Claim 12 is dismissed, albeit through conduit already constructed by another party.

*County*, 49 F.Supp.2d at 817 (fees must be set at a level reasonably calculated to compensate municipalities for the costs of administering franchise programs and maintaining the rights-of-way); *City of Dallas*, 8 F.Supp.2d at 593 ("the City does not have the authority to impose fees on a telecommunications provider except as compensation for use of the City's rights-of-way"). Consequently, fees based on revenue or overall profits would not be "fair and reasonable compensation." This authority suggests that § 253(c) limits municipalities to the recovery of reasonable costs and does not permit cities to profit from the use of its rights-of-way by others.

However, authority from this District points in another direction, concluding that this reading of the word "compensation" may "too severely limit the term" because such a reading would treat § 253(c) as if it permitted recoupment of "costs" rather than gaining of "compensation." *Omnipoint*, 1999 WL 494120, at *6 (citing *TCG Detroit v. City of Dearborn*, 16 F.Supp.2d 785, 789 (E.D.Mich.1998)). "Moreover, the term "compensation" has long been understood to allow local governments to charge rental fees for public property appropriated to private commercial uses. It is thus doubtful that Congress, by the use of the words "fair and reasonable compensation," limited local governments to recovering their reasonable costs."[11] *Id.*

Consequently, the *Omnipoint* court and others have been willing to permit fees based upon general revenues and other considerations not directly related to a municipality's expenses in maintaining the rights-of-way. *See TCG Detroit v. City of Dearborn*, 206 F.3d 618, 625 (6th Cir.2000) (affirming district court ruling upholding fee based on 4% of gross revenue, lump sum franchise fee, and conditional requirement that plaintiff install conduit for the city at no charge); *BellSouth Telecommunications, Inc. v. City of Orangeburg*, 337 S.C. 35, 43, 522 S.E.2d 804 (S.C.1999) (finding "franchise fee equal to a percentage of the revenue generated is not inherently unfair or unreasonable"); *Omnipoint*, 1999 WL 494120, at *6–8 (finding that local governments were not likely limited to recovering only their reasonable costs of rights-of-way). These cases have found nothing inappropriate with cities charging "rent" for the use of city-owned property for private purposes. *See Omnipoint*, 1999 WL 494120, at 6; *TCG Detroit v. City of Dearborn*, 16 F.Supp.2d 785, 789 (E.D.Mich.1998), affirmed, 206 F.3d 618, 625 (6th Cir.2000); *see also City of St. Louis v. Western Union Tel. Co.*, 148 U.S. 92, 99, 13 S.Ct. 485, 37 L.Ed. 380 (1893) ("Suppose a municipality permits one to occupy space in a public park, for the erection of a booth in which to sell fruit and other articles; who would question the right of the city to charge for the use of the ground thus occupied ... ? So, in like manner, while permission to a telegraph company to occupy the streets is not technically a lease ... it is the giving of the exclusive use of real estate, for which the giver has a right to exact compensation, which is in the nature of rental.").

The "rent" charged, however, must be "fair and reasonable." *City of Dearborn* held that this fairness determination should be made by examining the totality of the facts and circumstances in the case. *City of Dearborn*, 16 F.Supp.2d at 789, affirmed, 206 F.3d at 625. There, the district court identified four non-exclusive factors relevant to whether the fees exacted from the telecommunications provider by the city of Dearborn—fees which were substantially similar to those the City is trying to impose here—were not inappropriate: "(1) the extent to use of the public

**11.** Moreover, as acknowledged by the parties in the Stipulated Facts, calculating the impact or costs of telecommunications providers on the public rights-of-way would not be a simple undertaking. *See* Stipulated Facts ¶ 45. A number of intangible factors would need to be considered, including the shortened life of pavement, added police costs to deal with traffic disruptions, interference with the City's other systems, impact on traffic, and offsetting benefits to the City from the availability of multiple telecommunications providers.

rights-of-way; (2) whether other carriers have agreed to comparable compensation (or comparable uses of public rights-of-way); (3) the course of dealings among the parties; and (4) whether the compensation sought is 'so excessive that it is likely to render doing business unprofitable.'" *Omnipoint*, 1999 WL 494120, at 7 (citing *City of Dearborn*, 16 F.Supp.2d at 790–91).

Applying the *City of Dearborn* factors to the record as set forth in the Stipulated Facts, this Court finds that the City has sustained its burden to prove that the fees sought to be imposed are fair and reasonable. First, the contemplated use of the public rights-of-way by TCG appears to be extensive. Although TCG first submitted an application in 1998 to install less than 2500 feet of fiber optic cable and about 240 feet of underground conduit, it now appears that TCG intends to "construct and operate facilities for the provision of telecommunications services throughout the City." Stipulated Facts ¶ 54.

Second, a number of other carriers have agreed to the fee provisions proposed by the City here. Northeast Networks, Inc., Metromedia Fiber Network Services, Inc. and Brooks Fiber Communications each have franchise agreements with the City imposing a franchise fee based upon 5% of its gross revenues in the City limits. Metromedia and Brooks Fiber's franchise agreements also impose substantially identical additional fees, including a minimal annual fee ranging from $5,000 to $10,000, a requirement that they pay third party costs, and a provision requiring that they build additional conduit for the City at no charge. In addition, Brooks Fiber's agreement requires a guarantee from the its parent. *See* Stipulated Facts, Exhibits

7, 29, 30 and 39. The Court also notes that carriers in other jurisdictions have apparently agreed to pay fees based upon gross revenues. *See City of Dearborn*, 16 F.Supp.2d at 790 (upholding 4% gross revenue fee, and noting 3 other carriers who agreed to similar fees); *City of Orangeburg*, 337 S.C. 35, 522 S.E.2d 804, 808; *City of Coral Springs*, 42 F.Supp.2d at 1309; *Town of Palm Beach*, 127 F.Supp.2d at 1353, *City of Tucson*, 950 F.Supp. at 971. Moreover, as discussed below, TCG itself appears to have accepted the fee provision during negotiations. Indeed, TCG has entered into other agreements in New York State in which it has agreed to pay a franchise fee that is calculated on the basis of gross revenue. *See* Stipulated Facts ¶ 64.

Third, the record clearly shows that negotiations were on-going and fairly constant since 1992, and resulted in extensive give-and-take by the parties, represented by knowledgeable counsel, over numerous proposed provisions.

Lastly, there is no basis to conclude that the fees sought would likely render doing business with the City unprofitable. As noted, other prospective franchisees have accepted them. On a number of occasions during negotiations, it appeared as if TCG itself would have accepted the fees requested and, at a minimum, the extensive correspondence and communications between the parties does not suggest that the level of fees proposed would have caused TCG to refuse to deal with the City.[12]

In light of these factors, the Court concludes that the City has demonstrated that the fees it seeks to impose in the August Proposal, including the guarantee provi-

---

12. For example, a TCG attorney in 1994 stated that it was her guess that TCG was willing to pay the 5% franchise fee in order to get into the business since another carrier had agreed to that amount. *See* Stipulated Facts ¶ 19. In addition, TCG twice gave the City written comments on proposed franchise agreements—once in 1994 and once in late 1998—without deleting the fee provisions. *See* Stipulated Facts ¶¶ 19 and 60. Moreover, a TCG executive conceded that TCG would have been willing to pay a 5% franchise fee and the other fees as late as August 1998. *See* Stipulated Facts ¶¶ 60 and 61. These examples reveal that TCG itself did not think such fees were likely to render business in the City unprofitable.

sion,[13] are neither unfair nor unreasonable compensation under § 253(c) of the TCA.

### 3. Is the Treatment of Bell Atlantic competitively neutral and nondiscriminatory?

Even if the regulations required by the City are found to manage the public rights-of-way and the fees it seeks to impose are found to be "fair and reasonable," § 253(c) is not satisfied unless the City can show that the regulations and compensation sought to be imposed are done so on a "competitively neutral and nondiscriminatory basis."[14] TCG contends that Bell Atlantic's exemption from having to enter into a franchise or from having to pay a fee is non-competitive and discriminatory, and, therefore, violates § 253(c).

The City need not treat Bell Atlantic and TCG identically in order to satisfy § 253(c). See Cablevision, 184 F.3d at 103 ("As long as the City makes distinctions based on valid considerations, it cannot be said to have discriminated against [the entrant] in favor of [the incumbent carrier]."); City of Dearborn, 16 F.Supp.2d at 792 ("the explicit language of the statute does not require such strict equality."); City of Dallas, 8 F.Supp.2d at 593 ("being competitively neutral does not require cities to treat all providers identically and to ignore the significant distinctions among them.").

Indeed, Congress offered a "parity" provision that would have prohibited local governments from imposing a fee that distinguished among different providers, including the incumbent provider. 141 Cong. Rec. H8427 (Aug. 4th 1995). In opposition to this proposal, Representative Stupak stated:

> Local governments must be able to distinguish between different telecommunication providers. The way the [parity] amendment is right now, they cannot make that distinction. For example, if a company plans to run 100 miles of trenching in our streets and wire to all parts of the cities, it imposes a different burden on the right-of-way than a company that just wants to string a wire across two streets to a couple of buildings. The [parity] amendment states that local governments would have to charge the same fee to every company, regardless of how much or how little they use the right-of-way or rip up our streets.

Congress promptly rejected this provision, and adopted instead the current version of § 253(c).

Here, the City presents powerful reasons why Bell Atlantic should be treated differently. For nearly one hundred years, Bell Atlantic has been installing equipment and facilities under the City's streets. Over this long period of time, Bell Atlantic has, in fact, been paying a fee to the City, in the form of having provided the City with free use of its conduit—a valuable asset—in exchange for using the rights-of-way. Specifically, Bell Atlantic has provided additional conduit at no charge for the City to build a communications system involving the City's police and fire facilities, traffic control system, schools, libraries and other municipal buildings. Moreover, Bell Atlantic must offer universal service and affordable rates to the City's residents, while new entrants

---

**13.** As the underlying fees are upheld to be fair and reasonable, the Court sees no reason why a guarantee from TCG's parent—which serves only to provide the City with greater assurance that its fees are paid on a timely and reliable basis—would not be similarly upheld.

**14.** At least one case has questioned whether § 253(c) imposes the requirement of competitive neutrality and nondiscrimination on the fee alone or whether it applies to both the fee and the municipality's management of the rights-of-way. See Cablevision, 184 F.3d at 100–02. This Court need not decide that issue here, and instead assumes arguendo—as the First Circuit did in Cablevision—that the requirement applies to both the fee charged and the City's management of its rights-of-way.

such as TCG may limit their offerings to the most profitable business centers.

Of the non-fee related provisions to which TCG objects and that have not been preempted by this Court, the focus of those remaining regulations in the Ordinance and the August Proposal seem to functionally apply only to those providers who intend to install new equipment and facilities in the rights-of-way and engage in new construction—e.g., submission of construction plans, performance bonds, indemnification for damage to property, regulations designed to minimize street disruption.

■ As TCG has not presented sufficient evidence showing that Bell Atlantic has newly constructed conduits or is engaged in any activity that may otherwise impact the physical rights-of-way of the City since the adoption of the Ordinance,[15] it cannot be said that exempting Bell Atlantic from those particular regulations has had a discriminatory or non-competitive effect.[16] Compare *Cablevision*, 184 F.3d at 103 ("Constructing new conduit requires digging up the City's streets and attendant disruption. Putting new cable in existing conduit or converting existing cable to new uses does not require digging up streets or disruption. Thus, it is not discrimination for the City to have different policies for the construction of conduit that is new and for the conversion of the uses to which existing conduit can be put.").

■ The fees that the City wishes to impose, however, are not based upon the construction of new facilities, but rather on the existence of revenue and the provision of services from networks running in the City's right-of-way. In this regard, the imposition of a disparate fee could, indeed, have a discriminatory or non-competitive effect.

Here, the City has offered evidence of what it considers to be Bell Atlantic's compensation-in-kind to the City by providing an extensive underground conduit network throughout the City, housing eleven miles of the City's cable network, free municipal use of conduit for certain governmental agencies, and universal service to all City residents. *See e.g.*, Stipulated Facts ¶¶ 113, 114, 116, 134–39. This extensive network Bell Atlantic has built clearly has been the result of a large capital expenditure by Bell Atlantic. Moreover, although the total amount has never actually been calculated, Bell Atlantic has foregone fees it could have charged the City for such municipal uses. *See* Stipulated Facts ¶ 118.

The Court finds this evidence is sufficient to sustain the City's burden that the fees charged to TCG and the fees paid by Bell Atlantic are competitively neutral and nondiscriminatory. TCG offers no proof that the fee "charged" to Bell Atlantic, as opposed to that which would be imposed on TCG, would have a noncompetitive or discriminatory effect. Simply asserting that the fees being charged were "different" or "unequal" is an insufficient demonstration that they are non-competitive or discriminatory in violation of § 253(c). *See City of Dearborn*, 16 F.Supp.2d at 792 ("Nothing in the debate of the Stupak–

---

15. There is only one mention of construction activity by Bell Atlantic in the last decade. *See* Stipulated Facts ¶ 116 ("The majority (maybe as much as 75%) of the conduit constructed by Bell Atlantic for use by the City was constructed prior to 1990. In many of the thoroughfares in the downtown area, the underground conduit predates 1990; any new conduit was probably placed in underlying areas or in short sections."). TCG has simply failed to adduce an appropriate factual predicate on this record to show that Bell Atlantic engaged in new construction activity in the City since the adoption of the Ordinance in December 1997. Accordingly, this opinion does not address the implications of such new construction, if any.

16. Whether Bell Atlantic itself would be required to be subject to the Ordinance, including a franchise agreement, if it decides to build more conduit or construct other telecommunications facilities in the City's rights-of-way in the future is a question beyond the scope of this particular dispute.

Barton amendment, which became § 253(c), indicates that it was intended to force local authorities to charge exactly the same fees and rates, and, in fact, it explicitly rejects that proposition."); *City of Dearborn*, 16 F.Supp.2d at 792 ("competitively neutral" and "nondiscriminatory" is not the same as being identical) (citing 141 Cong. Rec. H8427).

## II. New York State Law

Plaintiffs contend that the City's actions also violate New York State law (Claims 9 through 12). The Court discusses each of the two claims separately below.

### A. The New York Transportation Corporations Law

■ TCG contends that the August Proposal violates § 27 of the New York Transportation Corporation Law, which provides that a corporation deemed a "Telephone Corporation" under that act is authorized to place equipment in the local rights-of-way. N.Y. Trans. Corp. Law §§ 2 and 25 (granting the right to "erect, construct and maintain the necessary fixtures for its lines upon, over or under any of the public roads, streets and highways."). Moreover, § 27 states that a corporation subject to it is "authorized, from time to time, to construct and lay lines of electrical conductors under ground in any city, village or town within the limits of this state."

However, that statute also requires the permission of the local government to install any such equipment: "provided that such corporation shall, before laying any such line in any city, village or town of this state, first obtain from the common council . . . permission to use the streets within such city, village or town for the purposes herein set forth." § 27 of N.Y. Trans. Corp. Law.

While TCG contends that the local government's authority under § 27 is limited to giving permission as to where the facilities can be located, state courts have held that local governments may, consistent with their charters, require franchises. *See People's Cable Corp. v. City of Rochester*, 70 Misc.2d 763, 334 N.Y.S.2d 972 (N.Y.Sup.1972) (upholding—in response to challenge under § 27—the authority of a local municipality to impose a franchise fee on a cable operator); *Staminski v. Romeo*, 62 Misc.2d 1051, 1053, 310 N.Y.S.2d 169 (N.Y.Sup.1970) (noting that § 27 of the N.Y. Trans. Corp. Law requires that telegraph and telephone companies "obtain permission of the city . . . authorities to use local streets for the construction of its lines," and that this requirement has resulted in "companies having to obtain local franchises when they sought to construct . . . either above or below the public highways").

As the City's charter expressly authorizes it to seek a franchise and mandates that the franchisee "be required to pay annually to the city such percentage of the gross receipts arising from the use of such franchise" as shall be fixed by the agreement as "fair compensation," § 27 of the N.Y. Transportation Corporations Law is not violated. *See* Charter of the City of White Plains § 33 (Stipulated Facts, Ex. 3). Compare *New York Telephone Company v. City of Amsterdam*, 200 A.D.2d 315, 317–18, 613 N.Y.S.2d 993 (App.Div. 1994) (ruling that fee exacted in relation to excavation permit on per square foot basis was an unauthorized tax); with *Niagara Mohawk Power v. New York State Department of Transportation*, 224 A.D.2d 767, 769, 637 N.Y.S.2d 505 (App.Div.1996) (distinguishing between "permit fees . . . imposed under the power to regulate" held invalid under *Amsterdam* with "fee . . . for a license permitting . . . entry upon respondents' lands for the purpose of erecting transmission lines [based on fair market rental value]," and ruling that the latter is permissible).

### B. The New York Public Service Law

Plaintiffs assert that New York Public Service Law §§ 94 and 99 limit the City's

regulatory authority under the Ordinance and the franchise agreement by granting the PSC exclusive jurisdiction to regulate certain activities of telecommunications providers (Claim 10). According to plaintiffs, those aspects include, *inter alia*, the capitalization of telephone companies and their facilities, the manner in which their lines and property are leased, operated, or managed, the safety and security of lines, and the authority to inspect the property and records of the telephone carrier. *See* N.Y. Pub. Serv. Law § 94(2).

Plaintiffs argue that because TCG has obtained the necessary certificate of public convenience and necessity from the PSC, it follows that the PSC has reviewed and analyzed TCG's legal, financial and technical ability to construct and operate telephone and telecommunications facilities, and has found TCG to be qualified. Accordingly, plaintiffs claim that portions of the Ordinance and the August Proposal overlap with the PSC's jurisdiction and should be preempted.

Most of those provisions which TCG asserts are duplicative of, or are in conflict with, the PSC's jurisdiction either have been mooted by the August Proposal or dismissed by this Court. Accordingly, the Court need not address those particular sections of the Ordinance or the August Proposal.

The remaining provisions, which relate to topics such as renewal terms of the franchise, rights upon the termination of the franchise, change of control and assignment, do not, in this Court's opinion, implicate § 94 of the N.Y. Public Service Law in the manner TCG asserts. Accordingly, Claim 10 is dismissed.

### III. Due Process Under the Fourteenth Amendment

TCG claims that the City has violated its due process rights under the Fourteenth Amendment by taking, without compensation, TCG's "right" under the New York Transportation Corporation Law to use the public rights-of-way (Claim 13). As discussed above, the City has not "taken" property from TCG that was granted under § 27 of the N.Y. Transportation Corporations Law, but, instead, has exercised its right to approve or deny permission as granted by that statute. The City was simply exercising its regulatory powers in requiring TCG to agree to a franchise, and, accordingly, is not in violation of the 14th Amendment. *See New York Telephone Company v. Commissioner of New York State Department of Transportation,* 62 Misc.2d 6, 307 N.Y.S.2d 945, 949 (N.Y.Sup.1970) (finding no deprivation of property without just compensation under 14th Amendment where telephone company subject to § 27 of N.Y. Trans. Corp. was denied state franchise to install buried telephone cable); *see also New York Telephone Company v. Town of North Hempstead,* 41 N.Y.2d 691, 699–700, 363 N.E.2d 694, 395 N.Y.S.2d 143 (1977) (noting that "[t]elephone [c]ompany's right to erect poles under section 27 of the Transportation Corporations Law has been held to be a license or privilege" and not a property interest).

Moreover, even if the City's requirement of a franchise were to have taken a valid property interest, the City's requirements would, for 14th Amendment purposes, constitute a permissible economic regulation. *See Eastern Enterprises v. Apfel,* 524 U.S. 498, 523, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (noting that "party challenging government action as an unconstitutional taking bears a substantial burden," and that "[g]overnment regulation often curtails some potential for the use or economic exploitation of private property, . . . and not every destruction or injury to property by governmental action has been held to be a taking in the constitutional sense.") (internal quotations and citations omitted). Accordingly, plaintiffs' constitutional claim under the 14th Amendment is dismissed.

### CONCLUSION

For the foregoing reasons, this Court finds in favor of plaintiffs, in part, and in

favor of defendant, in part. The parties are directed to settle a judgment in 14 days on 5 days notice.

**SO ORDERED.**