**CITY OF AUBURN; City of Bremerton; City of Des Moines; City of Federal Way; A Municipality; City of Lakewood; City of Medina; City of Olympia; City of Puyallup; City of Renton; City of SeaTac; City of Tacoma; City of Tukwila; City of University Place; City of Vancouver, Plaintiffs–Appellees–Cross–Appellants,**

v.

**QWEST CORPORATION, Defendant–Appellant–Cross–Appellee.**

**No. 99–36173, 99–36219.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 2001.

Filed April 24, 2001.

Amended July 10, 2001.

Patrick Lynch, Emily Brubaker, O'Melveny & Myers LLP, Los Angeles, California; Judith A. Endejan, Williams, Kastner & Gibbs PLLC, Seattle, Washington; and Teresa Williams Gillespie, Qwest Corporation, Seattle, Washington, for the appellant/cross-appellee.

Carol S. Arnold, Preston Gates & Ellis LLP, Seattle, Washington, for the appellee/cross-appellants.

Appeal from the United States District Court for the Western District of Washington Franklin D. Burgess, District Judge, Presiding.

Before: RYMER, THOMAS, and McKEOWN, Circuit Judges.

## ORDER

The Opinion filed April 24, 2001 [247 F.3d 966] is amended as follows:

1. At 247 F.3d at 980, section II.C.1, second paragraph: Replace sentence reading: "A number of courts have held that various requirements imposed by local ordinances constitute a prohibition within the meaning of § 253(a)." with "A number of courts have held that certain requirements imposed by local ordinances constitute a prohibition within the meaning of § 253(a)."

2. At 247 F.3d at 981, section II.C.1, third paragraph: Replace sentence read-

ing: "The ordinances at issue in the present case include several features that have the effect of prohibiting the provision of telecommunications services." with "The ordinances at issue in the present case include several features that, in combination, have the effect of prohibiting the provision of telecommunications services."

3. At 247 F.3d at 981, section II.C.1, third paragraph: Delete sentence reading: "The Counterclaim Cities require application fees ranging from an undetermined amount (in Olympia) [FN 10] to $2,500 in Auburn and $5000 (in Des Moines and Tacoma)."

4. Delete footnote 10.

5. At 247 F.3d at 981, section II.C.1, fourth paragraph: Delete first two sentences and citation, and replace with the following:

"Taken together, these requirements 'have the effect of prohibiting' Qwest and other companies from providing telecommunications services, see *City of Dallas,* 52 F.Supp.2d at 770, and create a substantial and unlawful barrier to entry into and participation in the Counterclaim Cities' telecommunications markets."

At the end of the same paragraph, add the following as a new footnote:

"The Sixth Circuit noted that a regulation that allows denial of a franchise does not alone constitute a prohibition within the meaning of § 253(a). *See TCG Detroit v. City of Dearborn,* 206 F.3d 618, 624 (6th Cir.2000) (holding that a fee requirement is not preempted by § 253(a)). As in *City of Austin,* 975 F.Supp. at 939, our conclusion is based on the variety of methods and bases on which a city may deny a franchise, not the mere franchise requirement, or the possibility of denial alone. *See TCG Detroit,* 206 F.3d at 624 (citing *City of Austin* with approval) ."

6. At 247 F.3d at 981–82, section II. C.2, first paragraph: Delete first two sentences, and replace with: "Of course, a franchise requirement per se is not preempted by the Telecom Act. Only regulations that do not fall within a safe harbor provision, such as § 253(c), are preempted."

7. At 247 F.3d at 982, section II.C.2, paragraph beginning "Applying these guidelines:" Delete first sentence, and replace with: "Applying these guidelines, coupled with common sense, it is apparent that the ordinances establish franchise systems that regulate the telecommunications companies themselves, not merely the rights-of-way."

8. At 247 F.3d at 985 n. 19, replace "negotiation and acceptance" with "negotiations of the terms and discretionary acceptance".

With the foregoing amendments to the opinion, the panel has unanimously voted to deny appellees/cross-appellants' petition for rehearing.

The full court has been advised of the appellees/cross-appellants' suggestion for rehearing en banc, and no active judge of the court has requested a vote on whether to rehear the matter en banc. Thus, the suggestion for rehearing en banc is rejected.

## OPINION

McKEOWN, Circuit Judge.

This case presents issues of first impression concerning the relationship between various Washington municipalities and a major telecommunications provider, Qwest Corporation. We are called upon to decide (1) whether an ambiguous tariff filed with the state utilities commission trumps the common law and statutory rule that the utility company, rather than the municipality, bears the expense for a facility relocation made necessary by right-of-way improvements, and (2) whether state law and

the Federal Telecommunications Act of 1996 preempt certain city ordinances that establish a franchise system to manage telecommunications facilities in rights-of-way. We conclude that the tariff does not require the municipalities to shoulder the relocation costs, and that the ordinances are preempted.

In 1998, the cities of Auburn, Bellingham, Bremerton, Des Moines, Federal Way, Fife, Lakewood, Medina, Olympia, Puyallup, Renton, SeaTac, Shoreline, Spokane, Tacoma, Tukwila, University Place, and Vancouver ("the Cities") brought suit against Qwest in state court. They argued that, as a condition of Qwest's right to use the rights-of-way along city streets and roads, it was required by statutory and common law to relocate or pay for relocation of its facilities. Qwest removed the case to federal court, and filed a counterclaim against Auburn, Des Moines, Olympia, Tacoma, and University Place[1] (the "Counterclaim Cities") seeking a declaratory judgment that state law and the Federal Telecommunications Act of 1996 preempt the municipal ordinances establishing franchise and fee systems.

The district court granted summary judgment to the Cities on the relocation costs claim, and dismissed as unripe Qwest's counterclaim challenging the franchise ordinances. Both the Counterclaim Cities and Qwest appealed. These consolidated appeals involve two distinct issues—relocation costs and the preemption of city ordinances—which we discuss separately.

## DISCUSSION

### I. RELOCATION COSTS

■ Under Washington common and statutory law, when city street improve-

ments require the displacement of telecommunications equipment located in the city's right-of-way, the utility company bears the expense of relocating the equipment.[2] This has been the rule in Washington since before statehood. On February 21, 1996, Qwest (then U S West), notified cities and counties in western Washington that it would no longer bear these relocation costs. In support of its announcement, Qwest took the position that its tariff of rates and services, filed with the Washington Utilities and Transportation Commission ("WUTC") in 1967 and adopted without objection in 1968, shifted the payment burden to the cities. That tariff, WN U–31, has been revised and amended over the years; the current version reads in relevant part:

> When relocation or aerial to underground conversion of existing facilities is requested or required by law, the cost of constructing the new and removing the old facilities will be borne by the customer or others requesting the relocation or conversion.

WN U–31 para. 4.6.C

Relying on this language, Qwest refused to relocate or pay for relocation of its facilities to accommodate street improvement or relocation. This resulted, in at least one instance, in a Qwest-owned telephone pole standing in the middle of a newly-widened road. Later, Qwest agreed to relocate its equipment, but notified the cities of its intent to seek reimbursement for related costs.

■ After this appeal was filed and partially briefed, the Washington legislature passed major telecommunications legislation, entitled, "An Act relating to the use

---

**1.** The City of University Place has since revised its ordinances and was dismissed from the case.

**2.** *See* RCW § 80.36.040; *State of Washington v. Public Util. Dist. No. 1 of Clark County,* 55 Wash.2d 645, 349 P.2d 426, 429–30 (1960) (describing the common law rule).

of city or town rights of way by telecommunications and cable television providers." Engrossed Substitute Senate Bill 6676 ("ESSB 6676"). The parties agree that ESSB 6676, codified at WASH. REV. CODE ("RCW") § 35.99.010 et seq., supersedes Qwest's tariff and prospectively imposes the cost of relocating telecommunications facilities in city streets on the utility company.[3] Therefore, the question before us is limited to who bears the costs of relocation prior to the effective date of the new statute. We review de novo the district court's grant of summary judgment. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000).

## A. STATUTORY AND COMMON LAW BACKGROUND

We begin with the principle—with which both parties agree—that under Washington common law, the utility must pay the cost of relocation if required by public necessity. This stems from the conditional nature of a utility's right to have facilities in the public right-of-way. When the government allows a telecommunications company to place facilities in that right-of-way, the facilities' presence is contingent on the company's cooperation with maintenance and improvement of the street. 12 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 34.74.10 (3d ed.1970) ("it is generally held that the municipality may require a change in the location of pipes or other underground facilities of the grantee of a franchise, where public convenience or security require it"). This general rule is followed in virtually every jurisdiction, *id.* at n. 6 (noting that only Arkansas is in conflict), and has been embodied in Wash-

ington common and statutory law since before statehood in 1889.

The statutory rule can be traced to the old federal Post Roads Act, which required telegraph companies to maintain their lines so as "not to obstruct ... or interfere with the ordinary travel on such military or post roads." U.S. REV. STATS § 5263, 14 Stat. 221 (1866). The territorial legislature similarly provided that the right to construct telegraph lines was subject to the requirement that such lines "not unnecessarily obstruct[ ]" rights-of-way. 1866 Wash. Laws, approved January 18, 1866.

This rule continued to apply after statehood. Although the Washington Constitution recognized the right of telecommunications companies to construct and maintain facilities, it specifically authorized the legislature to adopt "reasonable regulations" relating to those facilities. WASH. CONST. art. XII, § 19. Indeed, the state legislature in its first session adopted a statute allowing telecommunications companies to construct facilities in rights-of-way "in such manner and at such points as not to incommode the public use of the ... highway[.]" 1889–90 Wash. Laws (now codified at RCW § 80.36.040).

The "as not to incommode the public use" language of § 80.36.040 has been interpreted by the Washington Supreme Court to allow a city to require the utility company to pay for relocation costs when a public street is improved or altered. *City of Seattle v. W. Union Tel. Co.*, 21 Wash.2d 838, 153 P.2d 859, 868–69 (1944); *City of*

---

**3.** The Counterclaim Cities moved for partial summary judgment on Qwest's counterclaim, and sought an order declaring prospectively that they have authority to require undergrounding. The district court denied the motion when it dismissed the counterclaim for lack of ripeness. The Counterclaim Cities'

appeal of this issue is rendered entirely moot by ESSB 6676, which makes clear that cities "may require service providers to relocate authorized facilities ...." RCW § 35.99.060. By definition, this relocation includes undergrounding.

*Edmonds v. Gen. Tel. Co.*, 21 Wash.App. 218, 584 P.2d 458, 463 (1978). The Washington Supreme Court has continued to hold that any right accorded to a utility company to maintain structures in public streets is subject to the state's police power, and the company must bear the expense of changes required by public convenience and necessity unless otherwise agreed. *See Wash. Natural Gas Co. v. City of Seattle*, 60 Wash.2d 183, 373 P.2d 133, 135–36 (1962); *P.U.D. No. 1*, 349 P.2d at 429.

■ Today, the classic statement of the rule in Washington is that "public utility companies operating under a franchise must bear the cost of removing and of relocating their facilities, as it is made necessary by highway improvements." *P.U.D. No. 1*, 349 P.2d at 429–30. This rule "may be changed by contract between the utility and a municipality so that relocation expenses are borne by the municipality, or may be changed by statute so that relocation expenses in certain cases are borne by the state, or the municipality." *Gen. Tel. Co. v. City of Bothell*, 105 Wash.2d 579, 716 P.2d 879, 882 (1986) (quoting MCQUILLIN § 34.74(a)).

**B. EVOLUTION OF QWEST'S TARIFF**

Qwest argues that this rule was changed by tariff WN U–31, originally filed by Qwest in 1967 and adopted by the WUTC in 1968. The original tariff read, in relevant part:

> [I]f the Company is requested to relocate its facilities underground, or if the Company is required by law to relocate its facilities underground, the cost of such relocating construction shall be borne by the owners of the real property served or by others requesting such relocation construction.

Pacific Northwest Bell Telephone Co. Rules and Regulations No. 23

The current language, first adopted in 1989—more than twenty years later—reads:

> When relocation or aerial to underground conversion of existing facilities is requested or required by law, the cost of constructing the new and removing the old facilities will be borne by the customer or others requesting the relocation or conversion.

WN U–31 para. 4.6.C

The difference between the two versions is significant; the original tariff is directed solely at undergrounding (that is, locating utility facilities underground), which has been encouraged in recent decades for aesthetic and safety reasons. Tariff WN U–31, however, has a different scope; it is not restricted to undergrounding, but purports to apply to *all* relocation. This broader language first appears in 1989; nothing in the record explains the purpose or intent of the change, and Qwest acknowledges that it first invoked the tariff to demand relocation costs in its 1996 letter to the Cities.

**C. ANALYSIS**

■ The question, then, is whether Qwest's current tariff altered its common law and statutory obligation to foot the bill for relocation costs. Qwest takes the position that the tariff language stating that relocation costs "will be borne by the customers or others requesting the relocation or conversion" includes the cities within the term "others." Qwest further argues that this tariff is equivalent to statutory law, and therefore alters the prior rule.

■ It is true that a tariff properly filed and authorized by law can alter the common law, at least between a utility and its customers. In *Moore v. Pac. Northwest Bell*, the Washington Court of Appeals noted that "[t]hese tariff schedules have the force of law and bind telephone customers." 34 Wash.App. 448, 662 P.2d 398,

403 (1983). In *Allen v. Gen. Tel. Co.*, the Court of Appeals concluded that a tariff limiting the telephone company's liability for misprinting a directory "becomes a part of the law of this State." 20 Wash. App. 144, 578 P.2d 1333, 1337 (1978).

◼ It is well settled, however, that tariffs are read to be consistent with preexisting statutory law, and cannot repeal or supersede a statute. *See People's Org. for Washington's Energy Res. v. Washington Util. and Transp. Comm'n,* 101 Wash.2d 425, 679 P.2d 922, 927 (1984) (tariff may not set terms that conflict with statute); *Nat'l Union Ins. Co. v. Puget Sound Power & Light,* 94 Wash.App. 163, 972 P.2d 481, 484–86 (1999) (holding that a tariff that purported to absolve utility from liability was ambiguous, and should not be interpreted in conflict with statutes). In this case, RCW § 80.36.040 authorized the city to require the utility to pay relocation costs. Qwest's tariff cannot, by itself, nullify that statute. This is especially true where, as here, the tariff is ambiguous.

*General Telephone Co. v. Bothell,* the case that Qwest views as dispositive, does not hold otherwise. *Bothell* involved a city ordinance that purported to exempt a city from the provisions of a utility tariff relating to undergrounding. In 1971, the WUTC adopted WAC § 480–120–076, providing that "[e]ach telephone utility shall set forth in its tariff its conditions for providing underground facilities." In 1977, pursuant to that regulation, General Telephone filed a tariff passing the costs to "the owners of real property served along the route of the constructed facility or to others requesting such relocation construction." *Bothell,* 716 P.2d at 881. Bothell, in 1981 and 1982, enacted ordinances requiring the utility company to pay for undergrounding of aerial wires—that is, purporting to supersede the statewide tariff

authorized by the regulation. General Telephone challenged the validity of the ordinances and argued that the tariff required Bothell, not General Telephone, to pay for undergrounding. The Washington Supreme Court first recognized that the tariff in that case was the law of the state before Bothell passed its ordinances. *Bothell,* 716 P.2d at 882–84. Stating that a city may not usurp the functions of the state public service commission, *Bothell* held that the city's ordinances were invalid where they conflicted with the tariff. *Id.*

Qwest argues that *Bothell*'s statement that "[t]ariffs enacted pursuant to such WUTC regulation have the force of state law and are preemptive authority over subsequently enacted city ordinances," 716 P.2d at 882, requires us to hold that Qwest's tariff supersedes or preempts statutory law. *Bothell* does no such thing. First, the tariff in *Bothell* was adopted pursuant to a specific administrative code provision directing the utility to include undergrounding costs in its tariff. Unlike relocation costs, neither Washington common law nor RCW § 80.36.040 encompassed allocation of undergrounding costs. *Bothell* did not involve the tension between the unambiguous common law (later codified) and an ambiguous tariff. Second, the *Bothell* opinion makes perfect sense when viewed in context—it would be absurd for a city to be able, by ordinance, to exempt itself from a prior tariff that was validly enacted and authorized by regulation. But that is not the case here, where the tariff at issue was not required by regulation, and where the Cities do not seek, by ordinance, to avoid compliance with a tariff.

Because it is well settled that a tariff cannot repeal a statute, we need not reach the question whether Qwest's tariff has the force of law or whether the tariff does in fact purport to change the prior rule.[4] We

---

4. In addition, we need not consider whether *Pierce County v. U S West,* No. 97–2–08395–3

(Wash.Sup.Ct. March 13, 1998) (holding that

hold that Qwest's tariff did not alter the long-established and unbroken rule established at common law and in RCW § 80.36.040 that the utility company must pay relocation costs.

## II. PREEMPTION OF THE CITIES' ORDINANCES

■ The next issue that confronts us is the question of state and federal preemption of local ordinances regulating telecommunications.

■ We begin with the Telecommunications Act of 1996 (the "Act" or the "Telecom Act"), Pub.L. 104–104, 110 Stat. 56 (1996), which was passed to promote competition among and reduce regulation of telecommunications providers.[5] To this end, the Act prohibits state and local governments from creating "barriers to entry," legal requirements that prohibit or have the effect of prohibiting a company from providing telecommunication service. 47 U.S.C. § 253 (Supp. IV 1999). Section 253 begins with a broad prohibition against state and local regulation, followed by certain narrow exceptions that leave a "safe harbor" for limited local regulation. One of these safe harbors, established by § 253(c), allows a local government to manage and collect fees for the use of public rights-of-way by telecommunication providers.

After the passage of the Act, the Counterclaim Cities (Auburn, Olympia, Tacoma, Des Moines, and University Place) passed ordinances that govern the use of public rights-of-way by telecommunications companies by requiring companies to obtain a "franchise," or permit. These ordinances are not identical, but are substantially similar. Under each ordinance, any telecommunications service provider that wishes to operate in the city must apply to the city for a franchise. Only franchised telecommunications companies may obtain permits to install facilities in public rights-of-way. Franchised companies are subject to extensive cost reporting obligations and controls over such matters as changes of stock ownership. The ordinances also require the company to provide excess capacity, and to offer services to the city at best-available rates. Three of the Counterclaim Cities charge a fee of between $2500 and $5000 to apply for a franchise. Each city reserves the right to grant, deny, or revoke a franchise for unnamed criteria, and in the discretion of the city. Finally, the ordinances provide that a city may remove the facilities of a company operating without a franchise, and a company operating without a franchise is subject to civil and criminal penalties.

Qwest's counterclaim seeks a declaratory judgment that the Counterclaim Cities' ordinances are preempted by state law and by the Telecom Act.

### A. RIPENESS

■ The district court dismissed Qwest's counterclaim as unripe, primarily on the grounds that "the analysis would be better conducted following specific attempts by the Counterclaim Cities to enforce their telecommunications ordinances." *Auburn v. U S West*, 79 F.Supp.2d 1214, 1218 (W.D.Wash.1999).

"or others" language in the identical tariff does not include municipalities), collaterally estops Qwest from challenging the tariff.

5. The full title of the Act is "An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." The conference committee report noted that the purpose of the statute is to provide for a "procompetitive, de-regulatory national policy framework." H.R.Rep. No. 104–458 (1996).

We review de novo the district court's dismissal of the counterclaim for lack of ripeness. *Natural Res. Def. Council v. Houston,* 146 F.3d 1118, 1131 (9th Cir. 1998).

The "basic rationale" of the ripeness requirement is "[t]o prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]" *Abbott Lab. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), abrogated on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). To determine whether Qwest's counterclaim is ripe for review, we evaluate (1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if we decline to consider the issues. *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1132 (9th Cir.1996) (citing *Abbott Lab.,* 387 U.S. at 149, 87 S.Ct. 1507).

The ripeness inquiry has a constitutional component rooted in the "case or controversy" requirement of Article III, and a prudential component that focuses on whether the record is adequate to ensure effective review. *See Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir.2000) (en banc). We address the constitutional component first, as it is jurisdictional, then proceed to the two-prong prudential inquiry required by *Abbott Laboratories.*

**1. Constitutional Component**

We may not hear a case unless "there exist[s] a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract." *Thomas,* 220 F.3d at 1138 (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)). This tenet of ripeness requires us to consider whether the plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," or, by contrast, if the alleged injury is too "imaginary" or "speculative" to support jurisdiction. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). We have little trouble concluding that this case satisfies the "case or controversy" requirement, and therefore the constitutional component of ripeness.

The case before us is remarkably similar to *Abbott Laboratories* and its companion cases, decided the same day. There, the Supreme Court held, the very promulgation of a law may itself affect a party enough to satisfy the constitutional requirement: "[t]here is no question in the present case that petitioners have sufficient standing as plaintiffs: the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions." *Abbott Lab.,* 387 U.S. at 154. If "[p]romulgation of the challenged regulations present[s] plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation," the controversy is ripe. *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (construing *Abbott Lab.*). This is particularly true when the regulations are burdensome and immediate. *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 170, 87 S.Ct. 1544 (1967) (noting the "immediate severity of the regulations' impact upon the plaintiffs"); *id.* at 173, 87 S.Ct. 1544 ("[I]t is quite clear that if respondents, failing judicial review at this stage, elect to comply with the regulations and await ultimate judicial determination of the validity of them in subsequent litigation, the amount

of preliminary paper work, scientific testing, and recordkeeping will be substantial.").

Qwest faces exactly this conundrum. As in *Abbott Laboratories*, the ordinances have "a direct effect on the day-to-day business" of telecommunications companies. There can be no question that Qwest is violating the ordinances—it owns and maintains facilities in the Cities' rights-of-way, and neither possesses nor has applied for a franchise. This is not a case like *Thomas*, where we held that a landlord's intent to violate a law was not enough. As we explained in *Thomas*, "[a]lthough we do not always require plaintiffs to await arrest or prosecution before entertaining a challenge to the constitutionality of a statute ... the threat of enforcement must be at least 'credible,' not simply 'imaginary or speculative.'" *Thomas*, 220 F.3d at 1140 (citation omitted). *See also San Diego*, 98 F.3d at 1127 (distinguishing hypothetical violation from situation where party has "previously engaged in and would continue to engage in acts regulated under the challenged legislation" and where prosecution is under agency's control). Only an about-face by the Counterclaim Cities would save Qwest from civil or criminal penalties. Nothing about this situation makes Qwest's dilemma any less severe than that faced by Abbott Laboratories. Nor is Qwest's dilemma speculative or conjectural. *Abbott Laboratories* does not require Damocles' sword to fall before we recognize the "realistic danger of sustaining a direct injury" that is the heart of the constitutional component of ripeness. *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301.

In sum, the enactment of these regulations "puts [Qwest] in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Lab.*, 387 U.S. at 152, 87 S.Ct. 1507. The decision to comply will surely be costly, and "[t]he alternative to compliance ... may be even more costly. That course would risk serious criminal and civil penalties. ..." *Id.* at 153, 87 S.Ct. 1507. This Hobson's Choice suggests the ripeness of the issue for review.[6]

### 2. Fitness of the Issues for Judicial Decision

Under the test laid out in *Abbott Laboratories*, we must examine the fitness of the issues for review. If a controversy is "essentially legal in nature," *W. Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1291 (9th Cir.1990), it is fit for judicial decision. This is the case when no "further factual amplification is necessary." *Id.; see also Abbott Lab.*, 387 U.S. at 149, 87 S.Ct. 1507 (issue was ripe where parties agreed that it was purely legal).

Qwest's counterclaim presents a pure question of law: Are the Counterclaim Cities' ordinances preempted by state or federal law? *See Industrial Truck Ass'n v. Henry*, 125 F.3d 1305, 1309 (9th Cir.1997) (stating that preemption is a matter of law). No further factual record would narrow or clarify that issue. As in *Abbott Laboratories*, there is no factual dispute about the activity conducted by Qwest, nor the applicability of the ordinances to its activity. Therefore, the controversy is essentially legal in nature.

**6.** The Counterclaim Cities also argue that Qwest does not have standing to challenge the ordinances. Standing, of course, overlaps substantially with ripeness. *Thomas*, 220 F.3d at 1138–39 (discussing similarity between standing and ripeness). In this case, the Counterclaim Cities' standing argument is inextricably linked with their ripeness challenge. Because we conclude that this case is ripe, we necessarily determine that Qwest—to whom the ordinances are directed—has standing to challenge the ordinances.

■ Although we ordinarily "do[ ] not consider an issue not passed upon below," the decision to resolve a question "for the first time on appeal is one left primarily to the discretion of the courts of appeals." *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). "[I]t is sometimes appropriate for an appellate court to pass on issues of law that the trial court did not consider." *Bibeau v. Pacific Northwest Research Foundation Inc.,* 188 F.3d 1105, 1111 n. 5 (9th Cir.1999).

In this case, we are faced with pure issues of law that were briefed extensively before the district court and again before the court of appeals. As such, there is a solid basis on which to consider the merits of the counterclaim.

**3. Hardship to the Parties**

■ For the second, or "hardship," prong of *Abbott Laboratories* to favor the party seeking relief, "[p]ostponing review must impose a hardship on the complaining party that is *immediate.*" *Anchorage v. United States,* 980 F.2d 1320, 1326 (9th Cir.1992). Qwest contends that the hardship in this case is the costly and cumbersome requirement to apply for and comply with a franchise, as the failure to do so exposes it to civil and criminal penalties. We agree that the franchise ordinances impose multiple obligations upon Qwest. For example, Qwest is required to pay an application fee of up to $5000; file an application containing detailed information unrelated to the rights-of-way; negotiate certain terms of the franchise with the cities; undergo extensive reporting and approval processes for transfers of ownership, including stock; provide excess capacity; and offer the cities favorable rates. Were we to decline to hear the case on

grounds of ripeness, Qwest would be forced to obtain a franchise and then return to court to argue that state and federal laws preempt the city ordinances—exactly the same argument that it makes here. This was precisely the situation in *Abbott Laboratories,* which the Supreme Court found ripe for review: "Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," the case is justiciable. 387 U.S. at 153, 87 S.Ct. 1507.

Having determined that this case is ripe, we proceed to consider the preemption claims on the merits.

**B. PREEMPTION BY STATE LAW**

Qwest argues that the local ordinances are preempted by state law, and further contends that it is exempted from any municipal franchise requirement by virtue of its statewide constitutional franchise.[7] The Counterclaim Cities counter that Washington's public utility laws do not preempt their management of municipal rights-of-way.

■ WASH. CONST. art. XI, § 11 requires that a local law yield to a state statute on the same subject matter if that statute "preempts the field, leaving no room for concurrent jurisdiction," or "if a conflict exists such that the two cannot be harmonized." *Brown v. City of Yakima,* 116 Wash.2d 556, 807 P.2d 353, 354 (1991). *See also Employco Personnel Servs., Inc. v. City of Seattle,* 117 Wash.2d 606, 817 P.2d 1373 (1991) (invalidating ordinance conflicting with state law).

---

7. Qwest claims that its corporate predecessor possessed a grant dating to territorial times, giving it the right to be present in the right of way. That grant, Qwest explains, was pre-

served in the territorial laws and was guaranteed into statehood by the Washington Constitution, and therefore exists independent of and immune from additional restrictions.

Four days after Qwest filed its opening brief in this case, the Washington legislature enacted ESSB 6676, codified at RCW § 35.99.010 et seq. That law significantly altered the ability of municipalities to regulate telecommunications utilities, especially wireline facilities of those who hold statewide grants or franchises.

The new law establishes a system by which cities may grant "master permits," or franchises, to telecommunications companies. The scope of the master permits is described in some detail, and limited in several ways. Importantly, ESSB 6676 excludes from its scope "a service provider *asserting an existing state-wide grant* based on a predecessor telephone or telegraph company's existence at the time of the adoption of the Washington Constitution to occupy the right of way." RCW § 35.99.010(3) (defining "master permit") (emphasis added); *see also* RCW § 35.99.030 ("[a] city or town may request, but not require, that a service provider with an existing state-wide grant to occupy the right of way obtain a master permit [i.e., franchise] for wireline facilities"). In addition, ESSB 6676 bars municipalities from adopting franchise systems that "regulate the services or business operations of the service provider, except where otherwise authorized in state or federal law." RCW § 35.99.040(1)(a). Each of these provisions affects the present case.

First, as noted above, ESSB 6676 specifically exempts companies asserting a statewide grant from any requirement to obtain a municipal franchise for wireline facilities. At oral argument, both parties agreed that Qwest asserts such a state-wide grant.

Because ESSB 6676 exempts a company asserting a statewide constitutional grant from municipal franchises, the relief sought in Qwest's counterclaim—so far as it deals with wireline facilities—has been granted by statute.

The ordinances' regulation of Qwest's wireline facilities clearly conflicts with RCW §§ 35.99.010(3) and 35.99.030. We therefore hold that ESSB 6676 preempts the franchise ordinances insofar as they purport to require a telecommunications company asserting a statewide constitutional grant to obtain a franchise for its wireline facilities.[8]

Having addressed wireline facilities, we are still faced with the issue of preemption with respect to wireless facilities. The remainder of the state and municipal franchise scheme is not so simple to resolve, in part because of the recent nature of ESSB 6676. The new law's prohibition on ordinances that "regulate the services or business operations of the service provider," RCW § 35.99.040(1)(a), could be interpreted to preempt ordinances that, for instance, require excess capacity or control stock transfers. In addition, some provisions of the ordinances might be preempted by state statutes regulating in the same subject area.[9] Further, the new law incorporates certain requirements of the Telecom Act by limiting the authority of cities and towns to regulate the placement of facilities if the regulation "[v]iolate[s] section 253 of the Telecommunications Act of 1996." RCW § 35.99.040(2)(c). Any analysis of state preemption, then, requires us to look to federal law.

---

**8.** Because ESSB 6676 grants Qwest a portion of the relief it seeks in its counterclaim, that portion of the counterclaim might also be considered moot. *See Kremens v. Bartley*, 431 U.S. 119, 129, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977) (holding that a new statute resolving the dispute moots a claim). Whether characterized as preemption or mootness, the result

is the same. The new law supersedes Qwest's claim.

**9.** For example, the state regulates issuance of stock and securities at RCW § 80.08.030; rates, fees, and capacity at § 80.36.080; rates and service § 80.36.130; and franchise fees and charges at § 35.21.860.

For these reasons, we decline to interpret as a matter of first impression the interplay between prior state laws and ESSB 6676, as applied to the Counterclaim Cities' ordinances regulating Qwest's wireless facilities. No Washington court has published an opinion involving any aspect of the new law; neither the WUTC nor the Washington State Attorney General has published any guidance as to its meaning or scope. Because we believe that a state court is better equipped to first interpret ESSB 6676 and its relationship with other state laws, and because the federal preemption issue is placed squarely before us by the new state law, we choose not to resolve the issue of whether other aspects of Washington state law preempts the ordinances' regulation of wireless facilities.

## C. PREEMPTION BY FEDERAL LAW

■ Qwest also argues that the Telecom Act preempts the ordinances, a claim that the district court dismissed as unripe. The question before the district court and on appeal is whether, on the facts alleged, Qwest is entitled to judgment as a matter of law. *See Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 529 (9th Cir.1997). We conclude that it is.

■ The Supremacy Clause, U.S. CONST. art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824). Within constitutional limits, Congress is empowered to preempt state law in several ways, including by expressly stating its intention to do so. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). In this case, there can be no doubt that the Act preempts expressly; it states that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). The question for the court, then, is whether the ordinances "interfere with, or are contrary to" the Act. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

### 1. Section 253(a)—Regulations Prohibiting or Having the Effect of Prohibiting Service

Section 253(a) bars all state and local regulations that "prohibit or have the effect of prohibiting" any company's ability to provide telecommunications services unless the regulations fall within the statute's "safe harbor" provisions (of which only § 253(c), related to local regulation of rights-of-way, is relevant here). The preemption is virtually absolute and its purpose is clear—certain aspects of telecommunications regulation are uniquely the province of the federal government and Congress has narrowly circumscribed the role of state and local governments in this arena. "Municipalities therefore have a very limited and proscribed role in the regulation of telecommunications." *AT & T Communications v. City of Dallas*, 8 F.Supp.2d 582, 591 (N.D.Tex.1998).

■ Section 253(a) preempts "regulations that not only 'prohibit' outright the ability of any entity to provide telecommunications services, but also those that 'may ... have the effect of prohibiting' the provision of such services." *Bell Atl. v. Prince George's County*, 49 F.Supp.2d 805, 814 (D.Md.1999), *vacated and remanded on other grounds*, 212 F.3d 863 (4th Cir. 2000). A number of courts have held that certain requirements imposed by local ordinances constitute a prohibition within the meaning of § 253(a). For example, an onerous application process, *Bell Atl.*, 49 F.Supp.2d at 814 ("[A]ny 'process for entry' that imposes burdensome require-

ments on telecommunications companies and vests significant discretion in local governmental decisionmakers to grant or deny permission to use the public rights-of-way 'may . . . have the effect of prohibiting' the provision of telecommunications services in violation of the [Act]."); a requirement to obtain a franchise, *see AT & T Communications v. City of Dallas,* 52 F.Supp.2d 763, 770 (N.D.Tex.1999) (a representation by the city that "without a new franchise . . . AT & T may not offer [services]" is "sufficient proof of the requisite prohibitive effect that triggers the preemptive force of § 253(a)."), vacated and remanded on other grounds, 243 F.3d 928, (5th Cir.2001); threat of penalties for failure to obtain a franchise, *AT & T Communications v. City of Austin,* 975 F.Supp. 928, 939 (W.D.Tex.1997) ("The threat of criminal sanctions and fines for the failure of an entity to obtain municipal consent can indubitably only be described as a prohibition."); or a combination of these factors, *TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81 (S.D.N.Y.2000) (regulations coupled with long approval process are a prohibition), may constitute a prohibitive effect. Taken together, these cases persuasively indicate that a regulatory structure that allows a city to bar a telecommunications provider from operating in the city "prohibit[s] or ha[s] the effect of prohibiting" the company's ability to provide telecommunications services under 47 U.S.C. § 253(a).

The ordinances at issue in the present case include several features that, in combination, have the effect of prohibiting the provision of telecommunications services. In order to obtain a franchise, telecommunications companies must submit a lengthy and detailed application form, including maps, corporate policies, documentation of licenses, certain specified items, and "[s]uch other and further information as may be requested by the City." AUBURN MUN. CODE § 20.06.020(J). After application, two of the cities (Auburn and Olympia) require a public hearing before granting or revoking a franchise. Each of the franchise systems authorizes the Cities to consider discretionary factors that have nothing to do with the management or use of the right-of-way. The ordinances all regulate transferability of ownership, even requiring franchises to report to stock sales. Some non-tax fees charged under the franchise agreements are not based on the costs of maintaining the right of way, as required under the Telecom Act.[10] And, the ultimate cudgel is that each city reserves discretion to grant, deny, or revoke the franchises and the Cities may revoke the franchise if the terms in the ordinance are not followed, even allowing the Cities to remove the company's facilities. Civil and criminal penalties are authorized as well.

Taken together, these requirements 'have the effect of prohibiting' Qwest and other companies from providing telecommunications services, see *City of Dallas,* 52 F.Supp.2d at 770, and create a substantial and unlawful barrier to entry into and participation in the Counterclaim Cities' telecommunications markets. Nearly identical city or county franchise structures have been found to constitute prohibitions under § 253(a). *See, e.g., Bell Atl.,* 49 F.Supp.2d at 816; *City of Dallas,* 52 F.Supp.2d at 770; *BellSouth Telecommunications v. City of Coral Springs,* 42 F.Supp.2d 1304 (S.D.Fla.1999).[11]

---

**10.** The parties agree that Washington law allows for a six percent gross receipts tax.

**11.** The Sixth Circuit noted that a regulation that allows denial of a franchise does not alone constitute a prohibition within the meaning of § 253(a). *See TCG Detroit v. City of Dearborn,* 206 F.3d 618, 624 (6th Cir.2000) (holding that a fee requirement is not preempted by § 253(a)). As in *City of Austin,* 975 F.Supp. at 939, our conclusion is based

## 2. Section 253(c)—Management of Public Rights–of–Way

Of course, a franchise requirement per se is not preempted by the Telecom Act. Only regulations that do not fall within a safe harbor provision, such as § 253(c), are preempted. As noted above, § 253(c) permits local regulations that "manage the public rights-of-way" and "require fair and reasonable compensation" for the "use" thereof. The Counterclaim Cities argue that each of the contested ordinances has a specific purpose that is related to the cities' ability to evaluate, permit, and manage telecommunications facilities in the rights-of-way.

The Telecom Act does not define "manage[ment of] the public rights-of-way," but we are not completely without guidance. A number of federal courts have relied upon the Federal Communications Commission ("FCC"), the agency charged with interpreting and enforcing the Act, for interpretive assistance. *See, e.g., TCG New York,* 125 F.Supp.2d at 90; *PECO v. Township of Haverford,* 1999 WL 1240941 (E.D.Pa. Dec.20, 1999); *BellSouth Telecommunications v. Town of Palm Beach,* 127 F.Supp.2d 1348, 1352–53 (S.D.Fla. 1999); *City of Coral Springs,* 42 F.Supp.2d at 1308; *Bell Atl.,* 49 F.Supp.2d at 815; *City of Dallas,* 8 F.Supp.2d at 591–92. As the FCC has explained, right-of-way management means control over the right-of-way itself, not control over companies with facilities in the right-of-way:

> [S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way .... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396 (F.C.C.1997), ¶ 103. The FCC, in turn, has looked to the legislative history for additional examples of right-of-way management. Senator Dianne Feinstein, during the floor debate on § 253(c), offered examples of the types of restrictions that Congress intended to permit under section 253(c), including requirements that:

> (1) "regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;" (2) "require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies;" (3) "require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;" (4) "enforce local zoning regulations;" and (5) "require a company to indemnify the City against any claims of injury arising from the company's excavation."

*In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 (F.C.C.1996), ¶ 39 (quoting 141 Cong. Rec. S8172 (daily ed. June 12, 1995) (statement of Sen. Feinstein, quoting

---

on the variety of methods and bases on which a city may deny a franchise, not the mere franchise requirement, or the possibility of denial alone. *See TCG Detroit,* 206 F.3d at 624 (citing *City of Austin* with approval).

letter from the Office of City Attorney, City and County of San Francisco)).

Applying these guidelines, coupled with common sense, it is apparent that the ordinances establish franchise systems that regulate the telecommunications companies themselves, not merely the rights-of-way. We focus on four significant features of the ordinances that violate § 253(c).

First, the ordinances require Qwest to undergo an extensive application process that is not directly related to management of the public rights-of-way. As described above, companies must submit a lengthy and detailed application form. AUBURN MUN. CODE § 20.06.020(J). This application includes data gathered by the cities in order to determine the financial soundness, technical qualifications, and legal ability to provide telecommunications services;[12] a description of all services provided currently or in the future;[13] and unnamed discretionary factors that may have nothing to do with the management or use of the right-of-way.[14]

█ Regulations requiring "the applicant [to] submit proof of its financial, technical, and legal qualifications" do not regulate the public rights-of-way. *Town of Palm Beach*, 127 F.Supp.2d at 1355. *See also City of Dallas*, 8 F.Supp.2d at 593 ("Dallas also does not have the power to require a comprehensive application and consider such factors as the company's technical and organizational qualifications to offer telecommunications services."); *City of Coral Springs*, 42 F.Supp.2d at 1310 ("financial, technical and legal qualifi-

cations"); *TCG New York*, 125 F.Supp.2d at 91. In addition, a description of telecommunications services to be provided does not directly relate to management of the rights-of-way. See *id.; City of Coral Springs*, 42 F.Supp.2d at 1309 ("[T]he City does not have the authority to request information regarding systems, plans, or purposes of the telecommunications facilities."). The upshot of the application process is to regulate the provision of telecommunications services rather than to regulate the right-of-way.

Second, the ordinances impose reporting requirements or other controls over matters not directly related to management of the rights-of-way. For example, the ordinances regulate ownership and certain transfers of shares of ownership of telecommunications companies, regardless of whether ownership affects the right-of-way.[15] Although the Counterclaim Cities may wish to "have a right to know" who owns shares in the telecommunications companies that use the public rights-of-way, the municipal regulation of stock transfers extends far beyond management of the rights-of-way. Because these regulations are more than necessary to "manage the rights-of-way," they do not fall within the safe harbor of section 253(c).

█ Third, the ordinances require, either through the application process or by other means, that franchise agreements contain certain conditions unrelated to management of the rights-of-way. For example, three of the cities require that fran-

---

**12.** AUBURN MUN CODE § 20.06.020(C), (D), (G); DES MOINES MUN. CODE § 20.02.012(8); OLYMPIA MUN. CODE § 11.04.020(I); TACOMA MUN. CODE § 16.04.4.2.5.2, 16.04.4.2.9.

**13.** AUBURN MUN. CODE § 20.06.020(C); DES MOINES MUN. CODE § 20.02.012(4); OLYMPIA MUN. CODE § 11.04.020(B); TACOMA MUN. CODE § 16.04.4.2.4.

**14.** AUBURN MUN. CODE § 20.06.020(J); DES MOINES MUN. CODE § 20.02.012(9); OLYMPIA MUN. CODE § 11.06.020(G); TACOMA MUN. CODE § 16.04.4.3.4.

**15.** AUBURN MUN. CODE § 20.10.290 (50% control); DES MOINES MUN. CODE § 20.06.70 (5% control); OLYMPIA MUN. CODE § 11.10.290 (50% control); TACOMA MUN. CODE § 16.01.8.3.3 (transfer of franchise).

chisees offer "most-favored-community" status—that is, the best available rates and terms.[16] These ordinances bear no relation to management .of the rights-of-way, but focus solely on rates, terms and conditions of service. *See, e.g., TCG New York*, 125 F.Supp.2d at 93 (holding that a most-favored clause "is more akin to a regulation of . . . rates, terms, and conditions of service unrelated to . . . use of the public rights-of-way"); *In re TCI Cablevision*, 12 F.C.C.R. 21396 at ¶105 (noting that "most favored nation" clauses are "difficult to justify under § 253(c) on the grounds that they are within the scope of permissible local rights-of-way management authority."). In addition, ordinance requirements that companies provide free or excess capacity[17] for the use of the cities or other users go beyond management of the rights-of-way. *See City of Dallas*, 8 F.Supp.2d at 593 (such requirements are "totally unrelated to use of the city's rights-of-way, and are thus beyond the scope of the City's authority").

Fourth, and perhaps most problematic, the ordinances grant the Counterclaim Cities unfettered discretion to insist on unspecified franchise terms and to grant, deny, or revoke a franchise based on unnamed factors.[18] This grant goes far beyond the limits of § 253(c), encompassing anything a city deems to be in the public interest. Like the other courts that have faced this question, we conclude that such ordinances are too vague and too broad to comply with § 253(c). *See, e.g., TCG New York*, 125 F.Supp.2d at 92; *City of Coral Springs*, 42 F.Supp.2d at 1306; *Bell Atl.*, 49 F.Supp.2d at 816 ("most objectionable is the fact that the ordinance vests the county with complete discretion to grant or deny a franchise application based on a wide-ranging set of factors that include 'whether the proposal will serve and protect the public interest.' "); *City of Dallas*, 8 F.Supp.2d 582, 592–93 ("The City does not, however, have the authority to grant or deny that franchise based on its own discretion. Rather, granting a franchise may only be conditioned on a company's agreement to comply with the city's reasonable regulations of its rights-of-way and the fees for use of those rights-of-way.").

We have specifically discussed only those aspects of the ordinances that most seriously violate § 253(c), but others are objectionable as well.[19] It is not enough to argue, as the Counterclaim Cities do, that the ordinances regulate *aspects* of telecommunications companies that are *related to their fitness to provide services*, and therefore use the rights-of-way. For example,

---

**16.** Auburn Mun. Code § 20.06.180(N); Des Moines Mun. Code § 20.01.10; Olympia Mun. Code § 11.10.370.

**17.** Auburn Mun. Code § 20.10.470; Des Mun. Code § 20.08.108; Olympia Mun. Code § 11.10.050(D); Tacoma Mun. Code § 16.01.6.2.5.

**18.** Auburn Mun. Code § 20.06.040(M) ("such other factors as may demonstrate that the Franchise to use the public ways will serve the community interest."); Des Moines Mun. Code § 20.03.18 (same); Olympia Mun. Code § 11.04.030(J) (same); Tacoma Mun. Code § 16.01.8.2.7 ("The City Council may, in its sole discretion which is hereby reserved, (1) approve or disapprove a License; and (2) require such terms and conditions in the License Agreement as deemed in the best interest of the City.").

**19.** For example, two cities' requirement for a public hearing before granting a franchise, see Auburn Mun. Code § 20.06.030, Olympia Mun. Code § 11.10.320; three cities' requirements for negotiations of the terms and discretionary acceptance of a franchise, see Auburn Mun. Code § 20.06.050, Des Moines Mun. Code § 20.02.19; Olympia Mun. Code § 11.04.050; and non-cost-based fees, see Auburn Mun. Code § 20.04.020, Des Moines Mun. Code § 20.09.112; Olympia Mun. Code § 11.04.020(K) (authorizing council to set fee); Tacoma Mun. Code § 16.01.5.3.1.

they say stock ownership is linked to a company's financial well-being, which may affect its continued existence, or its ability to pay fees or other necessary costs, which may ultimately affect its use of the right-of-way. This argument has the flavor of the old children's ditty, "Oh, your ankle bone connected to your leg bone, your leg bone connected to your thigh bone, your thigh bone connected to your hip bone ...."[20] This is simply too tenuous a connection to the "manage[ment] of rights of way." Under this semantic two-step, § 253(c) would have no limiting principle. The safe harbor provisions would swallow whole the broad congressional preemption. Municipalities could regulate nearly any aspect of the telecommunications business. Indeed, these regulations come perilously close to this *reductio ad absurdum.*

■■■ Under the Supremacy Clause, a local law "is nullified to the extent that it actually conflicts with federal law" by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough,* 471 U.S. at 713, 105 S.Ct. 2371 (citation omitted). Because these elements of the ordinances are contrary to § 253 of the Telecom Act, they are preempted.

### D. SEVERABILITY

■■■ To determine whether invalid portions of the ordinances are severable, we look to state law. *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) ("Severability is of course a mater of state law."). Under Washington law, the test for severability is whether

> the invalid provisions are unseverable and it cannot reasonably be believed that the legislature would have passed the one without the other ... or, alter-

natively, whether the elimination of the unconstitutional portion so destroys the act as to render it incapable of accomplishing the legislative purposes.

*State v. Anderson,* 81 Wash.2d 234, 501 P.2d 184, 186 (1972) (citation omitted). As the Counterclaim Cities note, a severability clause "offers to the courts the necessary assurance that the remaining provisions would have been enacted without the portions which are contrary to the constitution." *Id.* However, the existence of such a clause is not dispositive. Even with a severability clause, an ordinance must fall in its entirety when "the elimination of the [invalid] portion so destroys the act as to render it incapable of accomplishing the legislative purpose." *Guimont v. Clarke,* 121 Wash.2d 586, 854 P.2d 1, 16 (1993) (quoting *Anderson,* 501 P.2d at 186).

The Counterclaim Cities' ordinances contain a complex mix of application procedures, approval requirements, required franchise terms, financial and operations disclosure, and discretionary "catchall" clauses whose preempted provisions are so pervasive that it is not practicable to conduct a line-by-line severability analysis of each city's municipal code. Were we to do so, the elimination of preempted sections of the codes would result in regulation requiring a disjointed franchise application, a lack of standards for approval, disapproval, or revocation by the cities, and cross-references leading the reader to non-existent provisions. As the district court held in *Bell Atlantic,* "given the number and variety of provisions of the [cities'] telecommunications franchise law[s] that are preempted by the [Act], ... attempting to sever the invalid from the valid provisions would [not] be appropriate." *Bell Atl.,* 49 F.Supp.2d at 820–21 (applying Maryland Law).

---

**20.** DRY BONES (American spiritual derived from *Ezekiel* 37:1–14), *available at* h ttp://www.hope.edu/bandstra/RTOT/CH12/BONES.HTM.

This is not to say that the Counterclaim Cities cannot enact ordinances to manage the rights-of-way under § 253(c). But we cannot say that the objectionable portions of the present ordinances may be excised without rendering the end product a Swiss cheese regulation that would not be capable of "accomplishing the ordinances' legislative purposes." *Anderson*, 501 P.2d at 186.

CONCLUSION

We affirm the district court's order granting summary judgment for the Cities on their claim regarding relocation costs. We reverse the district court's order dismissing Qwest's counterclaim for lack of ripeness; we remand Qwest's counterclaim with regard to wireline facilities as preempted with instructions to grant judgment to Qwest because state law preempts the municipalities' ordinances with regard to wireline facilities. We remand Qwest's counterclaim with regard to wireless facilities with instructions to grant judgment to Qwest consistent with this opinion.

Affirmed in part and reversed in part and remanded with instructions. The parties shall each bear their own costs on appeal.